CertainTeed Gypsum NC, Inc. v. Duke Energy Progress, LLC, 2018 NCBC 90.

STATE OF NORTH CAROLINA

PERSON COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 395

CERTAINTEED GYPSUM NC, INC.,

Plaintiff,

v.

DUKE ENERGY PROGRESS, LLC,

Defendant.

**OPINION & FINAL JUDGMENT**

1.     THIS MATTER came on for trial without a jury before the undersigned commencing on July 9, 2018.  The Court now issues its Opinion & Final Judgment.

*Brooks, Pierce, McLendon, Humphrey, & Leonard, LLP by Jim W. Phillips, Jr., Brian C. Fork, and Kimberly M. Marston, for Plaintiff.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, LLP by Donald H. Tucker, Jr. and Isaac A. Linnartz, for Defendant.*

Gale, Judge.

## I.     INTRODUCTION

2.     This litigation involves disputes between Plaintiff CertainTeed Gypsum NC, Inc. ("CTG"), a wallboard manufacturer, and Defendant Duke Energy Progress, LLC ("DEP"), a public utility that operates plants to produce electricity, arising from their Second Amended and Restated Supply Agreement ("2012 Agreement"), regarding supply and acceptance of synthetic gypsum, a byproduct of coal-fired electric power plants and a raw material used to manufacture wallboard.  The parties define the synthetic gypsum that meets the contractual specifications as "Gypsum Filter Cake."

3. CTG and DEP first entered into a supply agreement in 2004 ("2004 Agreement"). At that time, DEP was planning to install flue gas desulfurization systems that would produce synthetic gypsum at its coal-fired plants in Roxboro, North Carolina ("Roxboro Plant") and Mayo, North Carolina ("Mayo Plant"), and CTG was seeking to build its first wallboard-manufacturing plant in the Southeast United States. CTG and DEP executed the Amended and Restated Supply Agreement in 2008 ("2008 Agreement") following CTG's decision to delay construction of its plant because of the 2008 economic downturn commonly referred to as the "Great Recession." The parties executed the 2012 Agreement when CTG was constructing its plant. The Court may refer to the 2004 Agreement, the 2008 Agreement, and the 2012 Agreement collectively as the "Supply Agreements."

4. A drop in natural gas prices has required DEP to decrease utilization of its coal-fired plants, resulting in its decreased production of synthetic gypsum. This decreased production has resulted in a dispute as to the quantity term of the 2012 Agreement, which has led to other disputes as to the terms and obligations of the 2012 Agreement.

5. The parties' disputes fall within four principal categories. The parties disagree: (1) as to the Minimum Monthly Quantity ("MMQ"), of Gypsum Filter Cake that DEP is required to supply and CTG is required to accept, including whether Gypsum Filter Cake means only synthetic gypsum produced at DEP's Roxboro Plant and Mayo Plant; (2) whether DEP has met its contractual obligation to use "commercially reasonable efforts" to maintain a stockpile ("Stockpile") of 250,000 net

dry tons of Gypsum Filter Cake and to furnish a replenishment plan ("Replenishment Plan") now that the Stockpile has fallen below that volume; (3) whether DEP is now excused from its contractual obligations because its performance is inconsistent with its primary purpose as a regulated public utility ("Primary Purpose"); and (4) if DEP's performance is not excused, whether CTG will be limited to an exclusive optional remedy of terminating the 2012 Agreement and recovering liquidated damages if DEP discontinues its supply obligation as defined by the 2012 Agreement.

## II. PROCEDURAL HISTORY

6. CTG initiated this action on June 30, 2017, by filing a Complaint, which sought only a declaratory judgment of the quantity term in the 2012 Agreement. (*See* Compl., ECF No. 19.)

7. On August 11, 2017, DEP filed its Notice of Designation As Mandatory Complex Business Case under N.C. Gen. Stat. § 7A-45.4. (ECF No. 6.) On August 11, 2017, this matter was designated as a mandatory complex business case by the Chief Justice. (ECF No. 1.) On August 14, 2017, the matter was assigned to the undersigned. (ECF No. 2.)

8. On August 24, 2017, CTG moved for summary judgment prior to the close of the pleadings, contending that it was entitled to its requested declaration as a matter of law based on the clear contract language of the 2012 Agreement. (ECF No. 11.)

9. On September 21, 2017, the Court heard argument on Plaintiff's Motion for Summary Judgment. On September 28, 2017, the Court provided an informal

oral ruling that it would deny Plaintiff's Motion for Summary Judgment because it found the relevant contract provisions to be ambiguous, requiring the Court to consider extrinsic evidence to determine the intent of the parties.

10. The parties proceeded with expedited discovery. The Court has noted that the parties have consistently acted in an exemplary and professional manner to move forward to an early trial and have only sought court intervention when their manifest good-faith efforts were able to narrow but not fully resolve disputes as to the scope or timing of discovery. Their conduct throughout the litigation is a clear example of the highest standards of professionalism to which trial lawyers should aspire.

11. On January 29, 2018, with leave of the Court, CTG filed its Amended Complaint to expand its request for declaratory judgment and seek additional relief, including compensatory damages, specific performance, and attorneys' fees and costs. (ECF No. 53.) CTG now asks the Court to declare that:

    a.    DEP is required to supply the MMQ of 50,000 Net Dry Tons of Gypsum Filter Cake for the entire term of the 2012 Agreement, subject to minor fluctuations permitted under Section 3.1;

    b.    DEP's supply obligation is not limited to Gypsum Filter Cake produced at its Roxboro Plant and Mayo Plant, and, as necessary, DEP may be required to obtain Gypsum Filter Cake from alternative sources at its own expense;

c. DEP is contractually obligated to use commercially reasonable efforts to maintain the Stockpile at 250,000 net dry tons of Gypsum Filter Cake and that the Replenishment Plan DEP prepared based on DEP's improper interpretation of the MMQ did not meet its contractual obligation; and

d. CTG continues to have the election to pursue specific performance rather than termination in the event DEP takes actions that would trigger the optional termination remedy.

(*See* Am. Compl. ¶¶ 71, 128.)

12. When filing its Amended Complaint on January 29, 2018, CTG also moved for a preliminary injunction. The Court was not required to hear this motion after being advised that the parties had reached an interim agreement, and the Court provided an expedited peremptory trial date.

13. On March 16, 2018, DEP filed its Answer to Plaintiff's Amended Complaint and Counterclaim, to which it later added a request for attorneys' fees and costs. (*See* ECF No. 91.) DEP asks the Court to declare that:

a. DEP's supply obligation is limited to Gypsum Filter Cake produced at its Roxboro Plant and Mayo Plant even if that production is less than the contractual MMQ, (Countercl. ¶ 25, ECF No. 124);

b. DEP is now excused from any supply obligation because its continued supply of Gypsum Filter Cake is inconsistent with its

Primary Purpose as a regulated public utility, (Countercl. ¶ 25); and

    c.    If DEP's supply obligation is not otherwise excused, the remedy of termination with the recovery of liquidated damages pursuant to Section 6.3 of the 2012 Agreement becomes CTG's exclusive remedy once DEP takes a contractually-defined action that triggers that section. (Countercl. ¶ 32.)

14. On May 9, 2018, DEP moved for partial judgment on the pleadings as to its request that the Court declare that CTG would be limited to an exclusive remedy once the termination remedy of Section 6.3 of the 2012 Agreement is triggered. After briefing, the Court orally advised the parties that it would reserve its consideration of this issue until trial.

15. On June 26, 2018, the Court issued an order incorporating its prior oral rulings on Plaintiff's Motion for Summary Judgment and Defendant's Motion for Partial Judgment on the Pleadings. (ECF No. 115.)

16. The parties waived their rights to a jury trial and consented to a trial held outside the county of origin. The trial commenced on July 9, 2018, at the North Carolina Business Court, 201 North Greene Street, Greensboro, North Carolina. The Court admitted seventy-three exhibits and received testimony from witnesses who appeared at trial and by video depositions.

17. The parties submitted proposed findings of fact and conclusions of law on July 30, 2018, and all issues and claims are now ripe for determination.

## III. GENERAL RULES OF CONTRACT CONSTRUCTION

18. When construing the 2012 Agreement, the Court has been guided by and has adhered to the following rules of contract construction. Although these standards may be properly considered, and are adopted, as part of the Court's Conclusions of Law, they are set out here to provide context for the Court's Findings of Fact. After making Findings of Fact, the Court makes further Conclusions of Law, which apply these rules of construction to the facts as the Court has found them to be.

19. "Whenever a court is called upon to interpret a contract its primary purpose is to ascertain the intention of the parties at the moment of its execution." *Lane v. Scarborough*, 284 N.C. 407, 409–10, 200 S.E.2d 622, 624 (1973). To do so, the Court must first look to the language of the contract and determine if it is clear and unambiguous. Where "the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." *Walton v. City of Raleigh*, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996). If the terms of the contract are unambiguous, then the court must interpret the contract as a matter of law and "cannot look beyond the terms of the contract to determine the intention of the parties." *Stovall v. Stovall*, 205 N.C. App. 405, 410, 698 S.E.2d 680, 684 (2010) (quoting *Lynn v. Lynn*, 202 N.C. App. 423, 431, 698 S.E.2d 198, 205 (2010)).

20. In some instances, the intent of the parties cannot be determined solely from the words of the contract. "An ambiguity exists in a contract if the 'language of a contract is fairly and reasonably susceptible to either of the constructions asserted by the parties.'" *Crider v. Jones Island Club, Inc.*, 147 N.C. App. 262, 267, 554 S.E.2d

863, 866–67 (2001) (quoting *Barett Kays & Assocs., P.A. v. Colonial Bldg. Co.*, 129 N.C. App. 525, 528, 500 S.E.2d 108, 111 (1998)). "[I]f there is any uncertainty as to what the agreement is between the parties, a contract is ambiguous." *Crider*, 147 N.C App. at 267, 554 S.E.2d at 867.

21. If a court finds a contract ambiguous, the intent of the parties becomes a question of fact. In that instance, "the language used, the subject matter, the end in view, the purpose sought, and the situation of the parties at the time" can all aid the factfinder in determining the intentions of the parties. *Cordaro v. Singleton*, 31 N.C. App. 476, 479, 229 S.E.2d 707, 709 (1976); *see also Century Commc'ns, Inc. v. Hous. Auth. of Wilson*, 313 N.C. 143, 146, 326 S.E.2d 261, 264 (1985) (noting that where contractual "language is uncertain or ambiguous, the court may consider all the surrounding circumstances, including those existing when the document was drawn, those existing during the term of the instrument . . . , and the construction which the parties have placed on the language, so that the intention of the parties may be ascertained and given effect"). The Court should review "the entire instrument" and "cannot reject what the parties inserted or insert what the parties elected to omit." *Weyerhaeuser Co. v. Carolina Power & Light Co.*, 257 N.C. 717, 719, 127 S.E.2d 539, 541 (1962). The terms of a contract "'are to be harmoniously construed, and if possible, every word and every provision is to be given effect.'" *WakeMed v. Surgical Care Affiliates, LLC*, 243 N.C. App. 820, 824, 778 S.E.2d 308, 312 (2015) (quoting *In re Foreclosure of a Deed of Trust*, 210 N.C. App. 409, 415, 708 S.E.2d 174, 178 (2011)).

22.     "[T]he law imputes to a person an intention corresponding to the reasonable meaning of his words and acts." *Howell v. Smith*, 258 N.C. 150, 153, 128 S.E.2d 144, 146 (1962). The "'legal consequences are not dependent upon the impressions or understandings of one alone of the parties to it. It is not what either thinks, but what both agree.'" *N. & W. Overall Co. v. Holmes*, 186 N.C. 428, 431, 119 S.E. 817, 818–19 (1923) (quoting *Prince v. McRae*, 84 N.C. 674, 675 (1881)). "[M]ental assent to the promises in a contract is not essential." *Howell*, 258 N.C. at 153, 128 S.E.2d at 146 (citing 17 C.J.S., Contracts § 32).

23.     To determine the true intent of the parties, courts should consider "all the surrounding circumstances," especially "the construction which the parties have placed on the language" of the contract prior to the parties' dispute. *Century Commc's*, 313 N.C. at 146, 326 S.E.2d at 264. This common law principle is embodied in the Uniform Commercial Code, which recognizes that course of performance, course of dealing, and usage of trade may also explain or supplement the written agreement. N.C. Gen. Stat. § 25-2-202 (2017). The parties' actual course of performance may be the "best indication" of what the parties "intended the writing to mean." *Id.* § 25-2-202, Official cmt. 2.

24.     The Supreme Court of North Carolina has stated that "no court can go wrong by adopting the *ante litem motam* practical interpretation of the parties, for they are presumed to know best what was meant by the terms used in their engagements." *Heater v. Heater*, 53 N.C. App. 101, 105, 280 S.E.2d 19, 22 (1981) (citing *Cole v. Fibre Co.*, 200 N.C. 484, 488, 157 S.E.2d 857, 859 (1931)). The Supreme

Court of North Carolina has explained that "parties are presumed to know the intent and meaning of their contract better than strangers," therefore when parties "have placed a particular interpretation on their contract after executing it, the courts ordinarily will not ignore that construction which the parties themselves have given it prior to the differences between them." *Davis v. McRee*, 299 N.C. 498, 502, 263 S.E.2d 604, 607 (1980).

25. "Evidence of statements and conduct by the parties after executing a contract is admissible to show intent and meaning of the parties. 'The conduct of the parties in dealing with the contract indicating the manner in which they themselves construe it is . . . controlling in its construction by the court.'" *Heater*, 53 N.C. App. at 104, 280 S.E.2d at 21–22 (quoting *Bank v. Supply Co.*, 226 N.C. 416, 432, 38 S.E.2d 503, 514 (1946)); *see also Joyner v. Adams* 87 N.C. App. 570, 574, 361 S.E.2d 902, 904 (1987) ("Evidence of the parties' purposes in entering a contract and their conduct after the agreement is some evidence of their intent.").

26. When faced with ambiguity, the Court cannot substitute its own intent, but can only enforce the agreement reached by the parties. "Under longstanding North Carolina law, a valid contract requires (1) assent; (2) mutuality of obligation; and (3) definite terms." *Charlotte Motor Speedway, LLC v. Cty. of Cabarrus*, 230 N.C. App. 1, 7, 748 S.E.2d 171, 176 (2013). "It is a well-settled principle of contract law that a valid contract exists only where there has been a meeting of the minds as to all essential terms of the agreement." *Northington v. Michelotti*, 121 N.C. App. 180, 184, 464 S.E.2d 711, 714 (1995). The parties "must assent to the same thing in the

same sense, and their minds must meet as to *all* the terms." *MCB, Ltd. v. McGowan*, 86 N.C. App. 607, 608, 359 S.E.2d 50, 51 (1987).

## IV.  FINDINGS OF FACT

27.    The Court makes the following findings of fact based on the testimony presented and documentary evidence admitted.  The evidence presents mixed issues of law and fact. Any determination later stated as a conclusion of law that should have been stated as a finding of fact is incorporated in these Findings of Fact.

28.    The Court incorporates by reference the parties' factual stipulations filed on July 6, 2018, (ECF No. 125), and the parties' stipulations stated in the Final Pretrial Order entered on July 9, 2018.  (ECF No. 129).

29.    While the Court cites specifically to certain portions of the record in this Opinion & Final Judgment, the citations are for ease of reference.  Those citations do not represent all the evidence upon which these Findings of Fact are based.  The Court has considered the credibility of the witnesses in light of all evidence presented.

### A.    <u>The Parties</u>

30.    CTG is a Delaware corporation that manufactures and sells wallboard, commonly referred to as drywall.  CTG is the successor-in-interest to BPB NC Inc., which negotiated and executed the 2004 Agreement.  (Factual Stipulations ¶ 1.)

31. DEP is a North Carolina limited-liability company. DEP is the successor-in-interest to Progress Energy, Inc. and Carolina Power & Light Company.[1] (Factual Stipulations ¶ 2.)

32. DEP owns and operates multiple power-generating plants in North Carolina and other states. DEP has different fuel sources for its power-generating plants—some plants are powered by natural gas and others are powered by coal. Some plants have multiple power-generating units. DEP's coal-fired Roxboro Plant has four generating units, and its coal-fired Mayo Plant has one generating unit.

33. DEP is a regulated public utility, and as such is required to provide "reliable and economical utility service[s]." N.C. Gen. Stat. § 62-2(3) (2017). DEP refers to this requirement as its "Primary Purpose." (*See* Ex. 15 § 3.9.) DEP is required to commit and dispatch its power-generating units in an economical order, known as the "Least-Cost-Dispatch Requirement" or "Economic Dispatch." DEP considers multiple factors when determining which units to commit and dispatch, including the load forecast, what generation assets are available, the heat rates of those assets, the fuel costs of those assets, and the reliability of those assets. Essentially, DEP commits the least expensive unit first and then, as it needs more electricity, brings the next least expensive unit online.

---

[1] Each of the Supply Agreements were executed by predecessors of one or both of the parties. The parties agree that CTG and DEP are bound by the 2012 Agreement. For simplicity, throughout this Opinion & Final Judgment when referring to the parties to the Supply Agreements, the Court will refer to CTG and DEP, acknowledging that the predecessor companies were the actual parties to the earlier agreements.

34. DEP and Duke Energy Carolinas ("DEC") entered into a joint dispatch agreement ("Joint Dispatch Agreement"), which is an operating protocol established as part of the merger between the two companies that allows DEP and DEC to aggregate their resources in determining the least-cost way of meeting their aggregate demand.

**B. The Beginning of CTG and DEP's Contractual Relationship and the 2004 Agreement**

35. Federal legislation, commonly called the Clean Air Act, and related North Carolina legislation, known as the Clean Smokestacks Act, required DEP in the 1990s and early 2000s to install flue gas desulfurization systems ("FGD Systems"), commonly referred to as "scrubbers," at its North Carolina coal-fired electric power-generating plants. (*See* Ex. 111.) The scrubbing process removes pollutants from the emissions generated during the coal-combustion process and generates significant quantities of synthetic gypsum as a byproduct. DEP generally tries to find a beneficial reuse for its byproducts.

36. Around mid-2002, Danny Johnson ("Johnson"), a professional project manager at DEP, was searching for ways DEP could beneficially reuse the synthetic gypsum it expected to produce as a byproduct of the FDG Systems at DEP's Roxboro Plant and Mayo Plant. Johnson learned that synthetic gypsum is used to manufacture wallboard, to create cement, and as an agriculture soil amendment. (*See* Ex. 111.) At that time, DEP's Roxboro Plant and Mayo Plant were base-loaded power plants, meaning they were both high in the Economic Dispatch order and projected to be running constantly, resulting in the production of large quantities of

synthetic gypsum. At one point in Johnson's search, DEP estimated that by 2010, when the FGD Systems would be fully operational, the Roxboro Plant and Mayo Plant combined would produce 1.5 million tons of synthetic gypsum annually. (Ex. 111.)

37. DEP is not a broker of synthetic gypsum, nor does it have any use for synthetic gypsum in its normal operations. Thus, it needed to find a cost-effective method to beneficially reuse the synthetic gypsum. Absent such a use, DEP would incur significant costs to landfill the synthetic gypsum, which Johnson estimated to be approximately five dollars per ton. (Ex. 111.)

38. Around that same time, Peter Mayer ("Mayer"), CTG's Vice President of Technical Services, was in charge of finding a location in the Southeast United States for CTG to construct a wallboard-manufacturing plant ("CTG Plant"). Gypsum comprises about 90% of the raw materials needed to produce wallboard. Natural gypsum is not readily available in the Southeast. In searching for a location, CTG's main priority was finding a secure source of large quantities of synthetic gypsum. CTG needed to construct a plant near a supply of synthetic gypsum, because synthetic gypsum is heavy and extremely costly to transport. Mayer identified DEP's Roxboro Plant as a potential source of a large supply of synthetic gypsum.

39. Johnson learned of CTG's interest. He prepared a summary to his supervisors, stating that, after meeting with "all major wallboard manufacturers to understand their synthetic gypsum needs," he believed CTG "provided the most attractive opportunity through their desire to locate a wallboard facility at Roxboro

[and] pay for the gypsum material, and [because CTG] had a strong balance sheet."
(Ex. 111.)

40.     Mayer and Johnson then pursued discussions in an effort to fashion a mutually beneficial relationship, whereby CTG would build a manufacturing plant directly adjacent to DEP's Roxboro Plant. The intent was for DEP to achieve a beneficial reuse for its synthetic gypsum and CTG to have a secure supply of synthetic gypsum. At that time, CTG contemplated that its plant, upon completion and running at full capacity, would require approximately 600,000 tons of net dry synthetic gypsum annually.

41.     DEP agreed to sell 120 acres of land adjacent to the Roxboro Plant to CTG, and CTG agreed to purchase such land and construct the CTG Plant.

42.     Both CTG and DEP sought a long-term reciprocal commitment. Mayer indicated that multi-year supply contracts are typical in the wallboard industry. Both parties were motivated by long-range financial considerations. DEP was making a substantial investment in its FGD Systems and was facing millions of dollars in costs if it was unable to find a reliable, beneficial use for its synthetic gypsum byproduct. DEP also expected to incur the expense of constructing a conveyor system to deliver the Gypsum Filter Cake to the CTG Plant. (Ex. 5 § 2.2.) CTG contemplated a substantial capital investment to build the CTG Plant. When it decided to construct the CTG Plant, CTG knew that it would be dependent on DEP for its supply of synthetic gypsum at that plant because there was no other supplier

in close proximity, transportation costs were high, and there was no road or rail infrastructure to provide CTG an ability to access alternative sources.

43. DEP and CTG executed their first Supply Agreement—the 2004 Agreement—on February 12, 2004. Mayer and Johnson were the primary negotiators for the 2004 Agreement. Mayer was assisted by fellow CTG employees John College ("College") and Rob Morrow ("Morrow"), Vice-President of Supply Chain Management. The 2004 Agreement was, in substantial part, a forward-looking agreement, in that, at the time of its execution, neither party had made the financial investments they contemplated.

44. In order for CTG and DEP to induce the other's investment and to accommodate their ongoing needs, both parties determined that it was in their respective best interests to enter a long-term relationship and to make long-term commitments in exchange for long-term opportunities. The evidence is clear that DEP determined that entering a long-term agreement was in its best interest and consistent with its Primary Purpose as a regulated public utility.

45. The parties agreed to a twenty-year initial term measured "from the date on which the [CTG Plant] accepts the first delivery of Gypsum Filter Cake from [DEP]." (Ex. 5 § 8.1.) The 2004 Agreement further allowed for two additional extension periods of ten years each. (Ex. 5 § 8.2.)

46. The 2004 Agreement established a timeline in which DEP would construct the FGD Systems for the four Roxboro Plant units and the one Mayo Plant unit. (*See* Ex. 5 § 2.1.) DEP estimated that the first FGD Systems would begin

operation in the Spring of 2007 and that the final FGD Systems would be operational by the Spring of 2009. (*See* Ex. 5 § 2.1.) The parties agreed that, if DEP failed to complete the FGD Systems within six months of the completion dates agreed to and, as a result of such failure, DEP was unable to supply the MMQ of Gypsum Filter Cake after the CTG Plant was complete and ready to begin production, then CTG "shall be entitled to the remedies set forth in Section 6.2 of this Supply Agreement." (Ex. 5 § 2.1.) The Court finds that this provision was specific to DEP's potential failure to install its FGD Systems, and that the parties did not intend for this language to address, one way or the other, how Section 6.2 would apply for breaches occurring after the FGD Systems were installed.

47. The 2004 Agreement envisioned that the CTG Plant would be operational by late 2007 or early 2008. (Ex. 5 § 2.3.)

48. The 2004 Agreement defined the MMQ as "50,000 Net Dry Tons of Gypsum Filter Cake to be delivered on a monthly basis in accordance with Section 3.1." (Ex. 5 § 1.23.) Accordingly, the 2004 Agreement defined the MMQ in the agreement's definitional article and Section 3.1 provided the method of delivery and the time period when the MMQ would be implemented. DEP's obligation to deliver and CTG's obligation to accept Gypsum Filter Cake would begin once the CTG Plant was constructed. A lesser quantity of 30,000 net dry tons would be delivered and accepted during a six-month start-up period ("Start-Up Period"), after which the MMQ would apply. (Ex. 5. § 1.33; *see* Ex. 5 § 3.1.) Section 3.1 allowed for a permissible monthly variance from the MMQ, 10% up or down, so long as the monthly

average for any twelve-month period after the Start-Up Period was approximately equal to the MMQ of 50,000 net dry tons. (Ex. 5 § 3.1.) The 2004 Agreement recognized that DEP may produce more Gypsum Filter Cake than the MMQ, and such amount was defined as "Excess Gypsum," in which CTG was given the first refusal rights to purchase, and DEP had the first refusal rights to supply. (*See* Ex. 5 § 3.5.)

49. The 2004 Agreement also provided that DEP "will build and use reasonable efforts to maintain a 300,000 Net Dry Ton Gypsum Filter Cake stockpile." (*See* Ex. 5 § 2.2.)

50. The parties set forth the price at which CTG would purchase and DEP would sell Gypsum Filter Cake and the specific quality specifications for the Gypsum Filter Cake. (*See* Ex. 5 §§ 3.2, 4.1.)

51. The 2004 Agreement included an article defining respective remedies for failures to deliver or accept Gypsum Filter Cake. (*See* Ex. 5 §§ 6.1–6.5.) It also included an exclusive remedies clause. (Ex. 5 § 9.4.) In substantial part, those remedy provisions were carried forward in the 2008 Agreement and the 2012 Agreement.

52. The parties also agreed that "[i]f a legal action is initiated by any Party to this Agreement against another . . . any and all fees, costs, and expenses reasonably incurred by each successful Party . . . shall be the obligation of and shall be paid or reimbursed by the unsuccessful Party." (Ex. 5 § 16.7; *see also* Ex. 15 § 16.7.) This section remained unchanged in the 2008 Agreement and the 2012 Agreement.

C.   **The 2008 Agreement**

53.   The parties never actually delivered and accepted Gypsum Filter Cake under the 2004 Agreement before it was superseded by the 2008 Agreement.

54.   DEP began installing the FGD Systems in 2007 as scheduled.  However, CTG desired to delay its plant construction because of the adverse effect of the 2007 housing market crash and the Great Recession.  But CTG did not abandon its ultimate goal to build its plant and establish a presence in the Southeast market; therefore, CTG needed to maintain its relationship with DEP in order to ensure a secure supply of synthetic gypsum once it built the CTG Plant.

55.   On December 20, 2007, CTG contacted DEP in an effort to secure an agreement to maintain the supply agreement but delay construction of the CTG Plant.  (*See* Ex 16.)   CTG assured DEP that it "remain[ed] committed to the construction and operation of the plant with a start of production before November 2011." (Ex. 16, at 1.)  CTG further assured DEP that it would take any actions necessary to preserve the relationship, including taking steps to "ensure that we meet our obligations to accept synthetic gypsum under the supply agreement, that we do not add additional financial burden to your organization and that we do not impair the operations of the power plants."  (Ex. 16, at 2.)

56.   Although DEP expressed frustration with CTG's delay, it ultimately agreed to negotiate a revised agreement, and proposed fourteen terms it wanted to discuss, including CTG paying to expand the Stockpile storage capacity from 300,000

tons to 650,000 tons and increasing CTG's purchase obligations "to a level at or near [CTG's] Plant's capacity." (Ex. 17 ¶ 10; *see* Ex. 17 ¶ 5.)

57. The primary negotiators for the 2008 Agreement were Morrow, on behalf of CTG, and for DEP Barbara Coppola ("Coppola"), a Coal Byproducts and Reagents Manager, and Daniel Mottola ("Mottola"), a Byproducts Specialist. Negotiations leading to the 2008 Agreement occurred between January 2008 and March 2008.

58. The 2008 Agreement became effective on March 28, 2008. (Ex. 6, at 1.) Similar to the 2004 Agreement, the parties agreed that the 2008 Agreement would "expire twenty (20) years from the date on which the [CTG Plant] accepts the first delivery of Gypsum Filter Cake from [DEP]" ("2008 Term"). (Ex. 6 § 8.1.)

59. The 2008 Agreement eliminated the Start-Up Period defined in the 2004 Agreement and provided that CTG's obligation to accept Gypsum Filter Cake would begin "on the earlier of (a) November 1, 2008 or (b) when the Loading Facility is in Commercial Operation . . . .," each of which were before the CTG Plant would be operational. (Ex. 6 § 3.1.) Once CTG's obligation was triggered, and for the remainder of the 2008 Term, CTG was required to accept and DEP was required to deliver the MMQ of 50,000 net dry tons of Gypsum Filter Cake. (*See* Ex. 6 § 3.1.)

60. CTG did not have its own storage facility in Roxboro, North Carolina. Thus, prior to the CTG Plant being operational, CTG had to take steps to transport and utilize or dispose of any Gypsum Filter Cake it was required to accept.

**D.    CTG and DEP's Performance Under the 2008 Agreement**

61.    CTG first accepted Gypsum Filter Cake on May 1, 2009. CTG constructed rail facilities in Roxboro, North Carolina, and at its Toronto and Montreal, Canada wallboard-manufacturing plants, which allowed CTG to transport and then use the Gypsum Filter Cake.

62.    The CTG Plant began operations on March 28, 2012. Between May 1, 2009 and March 28, 2012, CTG accepted Gypsum Filter Cake and removed it from Roxboro by: (1) shipping it by rail from the Roxboro Plant to CTG's other wallboard-manufacturing plants; (2) landfilling both at a third-party landfill and at DEP's on-site landfill; and (3) subsidizing DEP's sale of synthetic gypsum to third parties. Ultimately, CTG spent over $32,800,000 prior to March 28, 2012 in an effort to take and dispose of Gypsum Filter Cake before the CTG Plant became operational. (*See* Ex. 142, at 9.) Even after the CTG Plant began operations, CTG continued to spend money to dispose of or transport Gypsum Filter Cake until it was able to fully utilize its deliveries.

63.    Throughout this period, DEP did not demand and CTG did not typically accept the contractual MMQ. Between May 2009 and August 2012, CTG accepted the MMQ eight times. (Factual Stipulations, Ex. 1.)

64.    During this period, DEP consistently maintained that the 2008 Agreement obligated CTG to accept the MMQ. (*See* Exs. 124–25.) However, rather than demanding CTG's full compliance, DEP worked cooperatively with CTG to limit CTG's acceptance to only levels necessary to maintain the Stockpile at a safe volume.

65.     Between 2008 and 2011, there was a decreased demand for wallboard as a result of the Great Recession, causing CTG to have more synthetic gypsum than it could utilize at its various manufacturing plants. David Engelhardt ("Engelhardt"), CTG's Senior Vice President of Operations, who later became CTG's President, testified that at that time, and for a period thereafter, CTG's need for synthetic gypsum was significantly less than its contractual obligations to purchase synthetic gypsum, both from DEP and pursuant to other supply agreements. Thus, CTG's management tried to address concerns regarding its inability to meet those contractual obligations. On March 6, 2009, CTG management considered a presentation captioned "Roxboro & Moundsville Excess DSG—A Mountain of DSG." (Ex. 35.) The presentation reflects that CTG hoped to modify its agreements with DEP to accept quantities "at production rate[s] rather than obligation rate[s]." (Ex. 35, at 5.) Essentially, CTG wanted to shift its acceptance obligation under the agreement from a fixed MMQ to a requirement that would vary based on DEP's actual synthetic gypsum production and CTG's needs. (Ex. 35, at 5.)

66.     Engelhardt testified that CTG expected that it would be able to accept and use the MMQ from DEP once the CTG Plant was fully operational, even if it had an oversupply for other plants, in part because CTG planned to redirect manufacturing from older plants to the new CTG Plant, with its more efficient manufacturing capabilities.

67.     On November 19, 2009, the parties amended the 2008 Agreement by executing the First Amendment to Amended and Restated Supply Agreement ("First

Amendment"), pursuant to which CTG agreed to incur the expense to landfill at least 80,000 tons of Gypsum Filter Cake at the DEP on-site landfill and remove sufficient tonnage from the Stockpile to reduce it to less than 600,000 tons. (*See* Ex. 59 ¶ 3.)

68. The parties further amended the 2008 Agreement by executing a Second Amendment to Amended and Restated Supply Agreement ("Second Amendment") on June 25, 2010. (*See* Ex. 14.) The parties agreed in the Second Amendment that, for the remainder of 2010, CTG would only be obligated to accept the amount of Gypsum Filter Cake actually produced at the Roxboro Plant and Mayo Plant. (*See* Ex. 14 ¶ 3.) The Second Amendment also provided that CTG would remove and incur the cost to landfill 200,000 net dry tons of Gypsum Filter Cake from the Stockpile. (*See* Ex. 14 ¶ 2.)

**E.    The 2012 Agreement**

69. CTG began constructing the CTG Plant in 2011. Construction presented some operational issues, including the method that would be used to transport Gypsum Filter Cake from DEP to the CTG Plant. The parties agreed that CTG could build, operate, and maintain equipment at DEP's storage facility to facilitate delivering Gypsum Filter Cake to the CTG Plant directly from the Stockpile. (*See* Ex. 28; Ex. 15 § 2.2.1.) The 2008 Agreement had to be modified, at a minimum, to accommodate these operational issues.

70. Between June 2011 and February 2012, Coppola and Engelhardt negotiated the 2012 Agreement with an effective date of August 1, 2012. As CTG had accepted its first delivery of Gypsum Filter Cake on May 1, 2009, the term of the 2012

Agreement was fixed at twenty years from that date. Accordingly, the 2012 Agreement is in effect until April 2029. (Ex. 15 § 8.1; *see also* Ex. 28, at 2.) The 2012 Agreement superseded the 2004 Agreement and the 2008 Agreement while carrying forward much of the substance of the earlier agreements without changes.

71.     Engelhardt was the first to propose a draft of the 2012 Agreement. Consistent with the objective reflected in the March 6, 2009 presentation considered by CTG management, Engelhardt proposed amending the MMQ to shift from a fixed contractual supply obligation to one that varied with the parties' variable business operations. DEP rejected most of Engelhardt's changes, including his MMQ proposal, expressing a preference to maintain the supply quantity as it existed.

72.     The Court now further makes its findings regarding the four major areas of dispute, which concentrate on these sections of the 2012 Agreement: Section 3.1 (MMQ); Section 2.2.3 (Stockpile); Section 3.9 (Primary Purpose); and Article 6, read in conjunction with Section 9.4 (remedies).

F.     **Disputed Terms of the 2012 Agreement**

(1)     **Section 3.1—The Minimum Monthly Quantity**

73.     The parties' dispute as to the quantity term of the 2012 Agreement centers on Section 3.1.

74.     Section 3.1 as adopted in the 2012 Agreement reads:

Commencing on May 1, 2009 and continuing until the earlier of (i) the Commercial Operation Date or (ii) October 1, 2012, [DEP] agrees to sell and deliver to CertainTeed and CertainTeed agrees to purchase and accept from [DEP] at least 50,000 Net Dry Tons of Gypsum Filter Cake per month, subject to the allowance for fluctuations as set forth in this paragraph, and except as may otherwise be excused by the terms of this

Revised Agreement. (The volume obligations set forth herein may be referred to as the **"Minimum Monthly Quantity"**.) In order to accommodate minor fluctuations in volumes actually delivered and accepted under this Revised Agreement, any quantities of Gypsum Filter Cake to be delivered under this Revised Agreement shall he deemed to be satisfied provided that such fluctuations (up or down) do not exceed ten percent (10%), and provided that the average monthly quantity of Gypsum Filter Cake delivered and accepted under this Revised Agreement over any twelve (12) month period after the Commercial Operation Date shall be approximately 50,000 Net Dry Tons, *or the aggregate actual Gypsum Filter Cake Net Dry Tons produced by the Roxboro Plant and the Mayo Plant over the same period, whichever is less.* [DEP's] expectation is to supply Gypsum Filter Cake primarily from the Roxboro Plant and Mayo Plant, but retains the right to supply Gypsum Filter Cake from any source.

(Ex. 15 § 3.1 (italics added).)

75. The italicized language was first added to Section 3.1 by the 2012 Agreement, and is the cornerstone of the parties' dispute as to whether the 2012 Agreement was intended to change the supply obligation as it had been understood in the earlier agreements. The parties agree that the MMQ was 50,000 Net Dry Tons of Gypsum Filter Cake, subject to acceptable minor fluctuations, in the 2004 Agreement and the 2008 Agreement. CTG contends that the parties' amendment to Section 3.1 in the 2012 Agreement did not change the base supply term of 50,000 Net Dry Tons of Gypsum Filter Cake, but only modified how acceptable minor fluctuations would be determined. DEP contends that the revised language changed the MMQ from a fixed quantity of 50,000 net dry tons to a variable quantity, which could be as low as DEP's actual production of Gypsum Filter Cake at its Roxboro Plant and Mayo Plant.

76. Prior to trial, the Court found, and again now finds, that the language of Section 3.1 is ambiguous. As more fully explained below, considering the language in the light of the extrinsic evidence presented, and particularly the historical negotiations that lead to the inclusion of Section 3.1 in the 2012 Agreement, the Court finds that the greater weight of the evidence demonstrates that the parties intended and agreed to carry forward the MMQ of 50,000 Net Dry Tons of Gypsum Filter Cake, subject to minor acceptable fluctuations, for the entire term of the 2012 Agreement, and that, by including the italicized language noted above, the parties further agreed to a modified method by which to determine those fluctuations.

(a)     The MMQ and Section 3.1 under the 2004 Agreement

77. In the 2004 Agreement, the parties included Section 1.23 in Definitions-Article I to define MMQ to "mean 50,000 Net Dry Tons of Gypsum Filter Cake to be delivered on a monthly basis in accordance with Section 3.1." (Ex. 5 § 1.23.) Section 3.1 provided when the delivery obligation would be triggered and the minor fluctuations that would be acceptable each month. (Ex. 5 § 3.1.)

78. Section 3.1 set two defined time periods—(1) the Start-Up Period, defined as the "initial six (6) month period of commercial operations of the [CTG Plant]," and (2) the remainder of the 2004 Term after the Start-Up Period ("2004 Term"). (*See* Ex. 5 §§ 1.33, 3.1.) During the Start-Up Period, the parties were only required to deliver and accept 30,000 net dry tons of Gypsum Filter Cake. (*See* Ex. 5 §§ 1.33, 3.1.) After the Start-Up Period, DEP was required to deliver and CTG was required to accept the MMQ as defined in Section 1.23—50,000 net dry tons. (*See* Ex.

§§ 1.23, 3.1.)  Section 3.1 also provided for allowable minor fluctuations, stating that the parties' obligations would be satisfied "provided that such fluctuations (up or down) do not exceed 10%."  (Ex. 5 § 3.1.)

79.     Section 3.1 provided in 2004, and has continued in all subsequent agreements to provide, that "[DEP's] expectation is to supply Gypsum Filter Cake primarily from the Roxboro Plant and Mayo Plant, but retains the right to supply Gypsum Filter Cake from any source."  (Ex. 5 § 3.1.)

(b)     Revisions to Section 3.1 in the 2008 Agreement

80.     The parties made three significant changes to Section 3.1 in the 2008 Agreement.  They agreed to: (1) eliminate the Start-Up Period, (2) add "Commercial Operation" dates, and (3) delete the definition of MMQ from the definitions article, leaving the MMQ to be defined only by the language of Section 3.1.

81.     When negotiating the 2008 Agreement in light of CTG's construction delay, DEP proposed that provisions related to the Start-Up Period in which CTG was obligated to accept less than the MMQ should be eliminated, and that the MMQ should be increased from 50,000 net dry tons to 55,000 net dry tons after CTG began or should have begun Commercial Operation.  DEP then proposed two periods with a different MMQ.  Its proposed Section 3.1 read as follows:

Commencing on the earlier of (a) November 1, 2008 or (b) when the Loading Facility is in Commerical Operation and continuing until the earlier of (i) the date the CertainTeed Manufacturing Plant commences Commercial Operation or (ii) November 1, 2011 [("Commercial Operation Period")], [DEP] agrees to sell and deliver to CertainTeed and CertainTeed agrees to purchase and accept from [DEP] at least 50,000 Net Dry Tons of Gypsum Filter Cake per month, subject to the allowance for fluctuations as set forth in this paragraph, and except as may

otherwise be excused by the terms of this Amended Agreement [("Commercial Operation Period MMQ")]. *Commencing on the earlier of (x) the date the CertainTeed Manufacturing Plant commences Commerical Operation or (ii) November 1, 2011, and continuing throughout the remainder of the Term of this Agreement [("2008 Term")], [DEP] agrees to sell and deliver to CertainTeed and Certainteed agrees to purchase and accept from [DEP] at least 55,000 Net Dry Tons of Gypsum Filter Cake per month subject to the allowance for fluctuations as set forth in this paragraph, and except as may otherwise be excused by the terms of this Amended Agreement* [("2008 Term MMQ")]. (The volume obligations set forth herein may be referred to as applicable the "Minimum Monthly Quantity.") In order to accommodate minor fluctuations in volumes actually delivered and accepted under this Amended Agreement, any quantities of Gypsum Filter Cake to be delivered under this Amended Agreement shall be deemed to be satisfied provided that such fluctautions (up or down) do not exceed 10%, and provided that the average monthly quantity of Gypsum Filter Cake delivered and accepted under this Amended Agreement over any twelve (12) month period after the Start-up Period shall be approximately 50,000 Net Dry Tons. [DEP's] expectation is to supply Gypsum Filter Cake primarily from the Roxboro Plant and Mayo Plant, but retains the right to supply Gypsum Filter Cake from any source.

(Ex. 11 § 3.1 (emphasis added).)

82.     DEP's proposed amendment did not change either the definition of acceptable minor fluctuations or the language retaining DEP's ability to supply synthetic gypsum from any source.

83.     The parties met to discuss DEP's proposed changes on February 14 and 15, 2008. CTG agreed to eliminate the Start-Up Period, but did not agree to increase the MMQ to 55,000 net dry tons. The net effect was to provide a single definition of the MMQ as 50,000 net dry tons, subject to the agreed fluctuations.

84.     On February 18, 2008, DEP's attorney circulated a draft intended to incorporate the agreements reached at the February meeting ("February 2008 Draft"). The February 2008 Draft was not produced in a redline format to show the

revisions that were rejected, changed, or agreed to. (*See* Ex. 18.) Section 3.1 in the

February 2008 Draft read as follows:

> Delivery of Gypsum. Commencing on the earlier of (a) November 1, 2008 or (b) when the Loading Facility is in Commercial Operation and continuing until the earlier of (i) the date the CertainTeed Manufacturing Plant commences Commercial Operation or (ii) November 1, 2011, [DEP] agrees to sell and deliver to CertainTeed and CertainTeed agrees to purchase and accept from [DEP] at least 50,000 Net Dry Tons of Gypsum Filter Cake per month, subject to the allowance for fluctuations as set forth in this paragraph, and except as may otherwise be excused by the terms of this Amended Agreement. (The volume obligations set forth herein may be referred to as the "**Minimum Monthly Quantity**".) In order to accommodate minor fluctuations in volumes actually delivered and accepted under this Amended Agreement, any quantities of Gypsum Filter Cake to be delivered under this Amended Agreement shall be deemed to be satisfied provided that such fluctuations (up or down) do not exceed 10%, and provided that the average monthly quantity of Gypsum Filter Cake delivered and accepted under this Amended Agreement over any twelve (12) month period after the Start-up Period shall be approximately 50,000 Net Dry Tons. [DEP's] expectation is to supply Gypsum Filter Cake primarily from the Roxboro Plant and Mayo Plant, but retains the right to supply Gypsum Filter Cake from any source.

(Ex. 18 § 3.1 (emphasis in original).)

85. The February 2008 Draft eliminated the entire sentence in DEP's earlier draft that would have defined a period after the Commercial Operation Period in which the MMQ would be increased to 55,000 net dry tons. As a result, the February 2008 Draft did not expressly include any MMQ for the contract term remaining after the earlier of November 2011 or the start of the Commercial Operation Period.

86. Neither the negotiators nor counsel recognized that omission. Ultimately, the parties executed the 2008 Agreement, adopting Section 3.1 as shown in the February 2008 Draft. (*See* Ex. 6 § 3.1; *see also* Ex. 18 § 3.1.)

87.     Despite the fact that Section 3.1 of the 2008 Agreement, as adopted, did not explicitly state a quantity term for the remainder of the 2008 Term, the parties agree that the MMQ under the 2008 Agreement was 50,000 net dry tons for the entire term of the 2008 Agreement, subject to the acceptable minor fluctuations. Morrow and Coppola both testified that their understanding and intent was to move the definition of MMQ to Section 3.1 and that the MMQ was to be 50,000 net dry tons for the entire term of the 2008 Agreement, subject to minor fluctuations.

88.     The Court finds that a drafting error resulted in there being no express MMQ for the entire term of the 2008 Agreement, but that notwithstanding that error and omission, under the 2008 Agreement, the parties intended, understood, and agreed that the MMQ was 50,000 net dry tons during both the Commercial Operation Period and the remainder of the 2008 Term, subject to the acceptable minor fluctuations, which remained unchanged from the 2004 Agreement. This drafting error did not affect the provision of Section 3.1 regarding DEP's expected source of Gypsum Filter Cake to meet its supply obligation, which was carried forward from the 2004 Agreement without change.

(c)     Section 3.1 of the 2012 Agreement

89.     Section 3.1 in the 2012 Agreement varies from the 2008 Agreement in two ways: (1) the definition of the Commercial Operation Period changed; and (2) the clause "or the aggregate actual Gypsum Filter Cake Net Dry Tons produced by the Roxboro Plant and the Mayo Plant over the same period, whichever is less" was

added.  The Court will now refer to this added clause as the "Aggregate Actual Production Clause."  (Ex. 15 § 3.1.)

90.  The Commercial Operation Period was changed to start on May 1, 2009, when CTG accepted its first delivery of Gypsum Filter Cake, and to end on the earlier of (a) the actual commercial operation date of the CTG Plant or (b) October 1, 2012 ("2012 Commercial Operation Period").  (Ex. 15 § 3.1.)

91.  Language that later became the Aggregate Actual Production Clause adopted in the 2012 Agreement originated in a draft Engelhardt proposed to begin negotiations for a new agreement.  That clause must be considered in context.  His proposed changes to Section 3.1 were accompanied by substantial other changes that DEP rejected.  The Aggregate Actual Production Clause was the sole portion of Engelhardt's proposals to the 2008 Agreement that was incorporated into the final 2012 Agreement.  CTG contends that the language in question was retained in order to change the acceptable minor fluctuations, but that the parties did not intend to change the fixed MMQ that had been in place since 2004.  DEP contends that the Aggregate Actual Production Clause was retained in Section 3.1 because DEP accepted CTG's proposal to replace a fixed MMQ with one that fluctuated based on production at its Roxboro Plant and Mayo Plant.

92.  The Court agrees with CTG and finds that the parties did not intend for the Aggregate Actual Production Clause to change the supply and acceptance obligations, but rather the parties understood, intended and agreed that the MMQ throughout the term of the 2012 Agreement, ("2012 Term"), would continue to be

50,000 net dry tons, and the Aggregate Actual Production Clause was intended, understood, agreed only to modify the method to determine minor fluctuations without otherwise modifying the MMQ from which those fluctuations are measured.

93.     When negotiating the 2012 Agreement, Engelhardt proposed not only substantial changes to Section 3.1, but also provisions regarding the Stockpile and other modifications that would allow either party to receive the essential benefit of the supply agreement even if the quantities supplied or accepted from month to month varied to a degree larger than the 10% variances allowed by Section 3.1 of the 2004 Agreement and the 2008 Agreement.  Engelhardt testified that he intended to provide both CTG and DEP flexibility consistent with the actual month-to-month and seasonal variations in production, but with protections through the Stockpile to ensure that each party would receive the expected benefit of the agreement.

94.     First, Engelhardt proposed a shift from a monthly emphasis to an annual term, with any default to be measured against that annual quantity.  (*See* Ex. 23 § 1.30; *see, e.g.*, Ex. 23 § 6.2 (stating in a redlined draft the remedies available to CTG "in the event [DEP] is unable to deliver to CertainTeed the Minimum Annual ~~Monthly~~ Quantity in any year ~~month~~ during the Term of this Revised Agreement and the stockpile falls below 100,000 Net Dry Tons . . . .").)  Engelhardt also proposed a new MMQ of 25,000 net dry tons per month, which would be an absolute minimum amount the parties could deliver and accept each month, but the primary focus would be satisfying the annual obligations.

95. Second, Engelhardt proposed that the parties agree to maintain an absolute minimum and maximum volume for the Stockpile to protect their respective needs ("Stockpile Buffer"). The minimum would be set at 100,000 net dry tons, assuring that CTG would always have access to at least two months' supply, and the maximum would be set at 600,000 net dry tons, with CTG required to remove any excess. (*See* Ex. 23 § 2.2.3(c).)

96. Third, Engelhardt substantially revised Section 3.1 to accommodate these changes. Engelhardt's proposed Section 3.1 stated:

> Commencing on May 1, 2009 and continuing until the earlier of (i) the date the CertainTeed Manufacturing Plant commences Commercial Operation or (ii) October 1, 2012, [DEP] agrees to sell and deliver to CertainTeed and CertainTeed agrees to purchase and accept from [DEP] at least *600.000* [sic] Net Dry Tons of Gypsum Filter cake per *year or the quantity of Gypsum Filter Cake produced by [DEP] during the said year, whichever is less, subject to the Stockpile in the [DEP] Storage Area not exceeding 600,000 Net Dry Tons,* and except as may otherwise be excused by the terms of this Revised Agreement. (The volume obligations set forth herein may be referred to as the ***"Minimum Annual Quantity"***.) *The Minimum Monthly Quantity of Gypsum Filter Cake that [DEP] agrees to sell and deliver to CertainTeed and that CertainTeed agrees to purchase and accept from [DEP] in any given month shall be 25,000 Net Dry Tons.* In order to accommodate minor fluctuations in volumes actually delivered and accepted under this Revised Agreement, any quantities of Gypsum Filter Cake to be delivered under this Revised Agreement shall be deemed to be satisfied provided that the average monthly quantity of Gypsum Filler [sic] Cake delivered and accepted under this Revised Agreement over any (12) month period after the beginning of the Commercial Operation shall be approximately 50,000 net dry tons, *or the actual Gypsum Filter Cake Net Dry Ton production over the same period, whichever is less.* [DEP's] expectation is to supply Gypsum Filter Cake primarily from the Roxboro Plant and Mayo Plant, but retains the right to supply Gypsum Filter Cake from any source. *Acceptance will include Gypsum Filter Cake conveyed to the CertainTeed plant, loaded into rail or trucks for transfer to other CertainTeed facilities, transferred to third parties, or added to the Stockpile providing that the Stockpile does not exceed 600,000 tons.*

(Ex. 23 § 3.1 (italics added).)

97.    Engelhardt deleted the language in Section 3.1 of the 2008 Agreement that allowed fluctuations in the monthly quantity so long as "such fluctuations (up or down) do not exceed ten percent" and substituted the Actual Aggregate Production Clause.  (*See* Ex. 23 § 3.1.)    He then substituted his proposal that would allow fluctuations to be measured by production but still subject to the requirements of this Stockpile Buffer.

98.    Under Engelhardt's proposal, CTG would be obligated to accept DEP's actual annual production of Gypsum Filter Cake or 600,000 net dry tons, whichever was less, *and* whatever amount of Gypsum Filter Cake was necessary to guarantee that the Stockpile did not exceed 600,000 net dry tons.  In turn, DEP would be required to maintain at least 100,000 net dry tons of Gypsum Filter Cake in the Stockpile at all times, irrespective of what DEP actually produced at its Roxboro Plant and Mayo Plant.

99.    Notably, Engelhardt's draft started from the language of Section 3.1 of the 2008 Agreement, which, as noted above, failed to include an express MMQ for the contract term remaining after the early Commercial Operation Period.  He then carried forward the same mistaken omission that had occurred in 2008.  It is clear, however, that Engelhardt intended to propose an annual supply obligation for the entire 2012 Term.

100.    Engelhardt sent his proposed draft to Coppola on October 20, 2011.  (*See* Ex. 23.)  After receiving Engelhardt's draft, Coppola expressed that DEP "would like

to leave the volume obligation as is," but agreed that the parties could discuss possible changes. (Ex. 25.) At that time, Coppola was aware that DEP was projecting that for the next several years, its Roxboro Plant and Mayo Plant would produce Gypsum Filter Cake in excess of 600,000 tons per year.

101. Neither Engelhardt nor Coppola recall having extensive conversations between October 2011 and February 2012. E-mails suggest some discussion occurred in November 2011, but no such discussion is further documented. (*See* Ex. 25.) Coppola testified that she and Engelhardt discussed Engelhardt's proposed changes in detail, but she was unable to recall any specifics regarding such discussions. Engelhardt testified that he and Coppola, in fact, had very few conversations between October 2011 and finalizing the 2012 Agreement.

102. Coppola first provided Engelhardt a counterproposal on February 10, 2012 ("February 2012 Draft"). (*See* Ex. 26.) The February 2012 Draft rejected most of Engelhardt's proposed edits.

103. Specifically, DEP deleted "Minimum Annual Quantity" as a defined term and all references to a "Minimum Annual Quantity" included throughout the agreement. (*See, e.g.*, Ex. 26 §§ 1.30, 2.2.3(c), 3.1, 6.2.) DEP reverted back to the language of the 2008 Agreement. DEP rejected Engelhardt's revised monthly minimum of 25,000 net dry tons. DEP reinserted the clause allowing 10% fluctuations (up or down), but also left in the Aggregate Actual Production Clause, which Engelhardt had proposed in lieu of the 10% fluctuation. DEP's February 2012

Draft, like the 2008 Agreement, did not state a fixed quantity term for the contract period remaining after the 2012 Commercial Operation Period.

104. DEP rejected Engelhardt's proposal to create a Stockpile Buffer with a guaranteed minimum and maximum volume. (Ex. 26 §§ 1.48, 2.2.3(c).) Rather, DEP's February 2012 Draft contained no quantity requirements for the Stockpile. (*See* Ex. 26 § 2.2.3.)

105. Lead negotiators for the parties met on February 14, 2012, in an effort to reach a final agreement. There was no testimony as to any specific discussion of Section 3.1 at the parties' February meeting.

106. Ultimately, Section 3.1 in the 2012 Agreement was adopted as it had been proposed in DEP's February 2012 Draft.

107. Even though she could not recall any specific negotiations, Coppola now testifies that she specifically recalls that the parties intended and agreed to create a new variable quantity term for the contract period after the 2012 Commercial Operation Period. Coppola testified that to accomplish this purpose, DEP intentionally accepted the Aggregate Actual Production Clause in order to accept CTG's proposal to move from a fixed to a variable MMQ. She testified that the parties agreed that the variable MMQ after the 2012 Commercial Operation Period would be:

> the average monthly quantity of Gypsum Filter Cake delivered and accepted under this Revised Agreement over any twelve (12) month period after the Commercial Operation Date shall be approximately 50,000 Net Dry Tons, or the aggregate actual Gypsum Filter Cake Net Dry Tons produced by the Roxboro Plant and the Mayo Plant over the same period, whichever is less.

(Ex. 15 § 3.1.) Coppola is the sole witness who recalls DEP's intent to change the MMQ to a variable term that could fall below 50,000 net dry tons if DEP's production fell. Even Coppola was unable to testify as to any discussion with CTG in this regard.

108. Engelhardt testified that he believed that when DEP rejected his other proposed changes, Section 3.1 essentially reverted back to the volume obligations as stated in the 2008 Agreement, but that the parties slightly modified the method for determining the allowable minor fluctuations. He understood that the parties agreed that a party would be deemed to satisfy its obligations under Section 3.1 if the two minor fluctuation requirements were each satisfied: first, any fluctuations from the 50,000 MMQ could not exceed 10% (up or down), and second, the average monthly quantity over a twelve-month period must equal the lesser of 50,000 net dry tons (essentially 600,000 net dry tons per year), or DEP's aggregate actual production at the Roxboro Plant and Mayo Plant. Engelhardt testified that because both conditions had to be satisfied, the net effect was that the parties would satisfy their volume obligation so long as DEP delivered and CTG accepted at least 540,000 net dry tons of Gypsum Filter Cake per year, or a maximum of a 10% variation each month.

109. Engelhardt testified that he agreed to the inclusion of the Aggregate Actual Production Clause based on his understanding that the MMQ would be between 45,000 and 55,000 net dry tons per month. Engelhardt explained that by leaving in the Aggregate Actual Production Clause, the parties were allowing for some fluctuation to the volume obligations—although not the fluctuation he had

requested—and that a guarantee of at least 45,000 net dry tons per month was sufficient to satisfy CTG's needs.

110. The Court finds that Engelhardt's proposed changes must be understood and read in conjunction with all of his revisions, including the addition of a Minimum Annual Quantity term, the inclusion of a Stockpile Buffer, and the deletion of the 10% fluctuations clause.

111. The Court finds that the Aggregate Actual Production Clause Engelhardt proposed was not, initially or when adopted, intended by either party to change the MMQ from the fixed volume of 50,000 net dry tons per month, subject to minor fluctuations, to a new variable MMQ based on DEP's actual production at its Roxboro Plant and Mayo Plant. Rather, as Engelhardt proposed an alternative monthly quantity, he also proposed an alternative method to determine acceptable fluctuations to substitute for the existing method based on a 10% variation of the fixed 50,000 net dry ton supply obligation. Engelhardt intended to allow for greater monthly variations while maintaining an annual quantity obligation and requiring a Stockpile Buffer. The Court finds that Engelhardt's various proposed modifications of the parties' supply and acceptance obligations were subject to the parties also agreeing to Engelhardt's proposed Stockpile Buffer, and once DEP determined to remain with a fixed MMQ of 50,000 net dry tons, neither CTG nor DEP intended or agreed to accept Engelhardt's proposed language as anything other than a modification to the manner in which fluctuations from that MMQ would be acceptable.

112. Following Engelhardt's promotion to CTG President, on February 22, 2012, Kim Bildfell ("Bildfell"), CTG's Vice President of Purchasing and Customer Satisfaction, assumed responsibility for negotiating the 2012 Agreement on behalf of CTG. Bildfell testified that the negotiations concerning Section 3.1 had been completed before she began participating in the negotiations and that she was not involved in any further negotiations concerning Section 3.1. Instead, she focused on addressing the Stockpile requirements in Section 2.2.3 and finalizing the operational changes.

113. On March 7, 2012, while reviewing a draft of the 2012 Agreement, Bildfell noted a question as to whether the changes to Section 3.1 would allow DEP to reduce its supply of Gypsum Filter Cake below 50,000 net dry tons even if CTG were to require that amount. (*See* Ex. 46 ¶ 8 ("What if [DEP] makes less than 50,000 consistently and we need 50,000 . . . [Section 3.1] reads 50,000 net dry tons, or the aggregate actual Gypsum Filter Cake Net Dry Tons produced by the Roxboro Plant and the Mayo Plant. Does this mean [DEP] no [sic] responsible if [sic] produce less than 50,000 consistently[?]").) Bildfell believes that she discussed this concern with Engelhardt, but she does not recall any specifics of a discussion with Engelhardt or anyone else regarding her question about Section 3.1. She testified that at the time she signed the 2012 Agreement, she understood that the MMQ was 50,000 net dry tons per month for the entire 2012 Term.

114. The Court finds that Bildfell's comments do not evidence that the parties intended and agreed that Section 3.1 of the 2012 Agreement changed the MMQ from

what it has been understood to mean since it was first established in the 2004 Agreement.

115. Other contemporaneous documentation is consistent with the Court's finding.

116. On August 17, 2012, Coppola emailed her supervisors a summary of the major changes to the 2012 Agreement. Notably, Coppola made no direct or indirect reference to the parties' alleged agreement to change the MMQ to a variable supply term. To the contrary, Coppola stated that there were "[n]o changes to the original intent of the document," explaining that the "primary changes" made in the 2012 Agreement reflected the parties' agreement that CTG could install additional equipment to the DEP Storage Area. (Ex. 28.) Coppola repeatedly stated that the volume obligations did not change, concluding that "[n]o changes to Article 3 – Gypsum Sales – this is important because *there has been no change to the obligation to deliver material in the original volumes specified*" and "[a]gain, the original terms around pricing and *volumes* remained untouched." (Ex. 28, at 2 (emphases added).)

117. Coppola now testifies that her August 17, 2012 e-mail was inaccurate. Attempting to explain the error, Coppola stated that, at the time she drafted the e-mail, she was focused on the changes the parties had made concerning the construction modifications. She further testified that at the time she drafted the e-mail, DEP forecast that the actual production of Gypsum Filter Cake at the Roxboro Plant and Mayo Plant would be at least 600,000 net dry tons per year, meaning the

volume obligation would effectively remain the same and there would have been no need to document a supply obligation based on different production scenarios.

118. Contrary to her testimony at trial, the Court finds that throughout the negotiations for the 2012 Agreement, Coppola and DEP remained committed to keeping the quantity term as it was. (*See* Ex. 25 (stating that DEP "would like to leave the volume obligation as is").) Consistent with its intent to keep the supply obligation the same, DEP rejected the substance of Engelhardt's proposed changes.

119. The Court does not find Coppola's current recollection or testimony at trial, which varies from her contemporaneous documentation, to be credible. A change from a fixed quantity to a variable quantity term would have been a fundamental change to the parties' agreement. If there was a clear and intentional effort to accept portions of Engelhardt's proposed language to make this shift, it is fair to expect that Coppola would have advised her management of such change. Instead, she advised management that there was no change. Further, considering that this new variable term would require DEP to complete month-to-month calculations to determine its rolling twelve-month average production in order for the parties to determine the MMQ each month, it is fair to expect that Coppola would have advised those who were to oversee the performance of the contract that they needed to make the necessary monthly calculations. It is clear she did not. There is no testimony or document reflecting that Coppola told anyone at or around the time the 2012 Agreement was executed that the MMQ had changed. The Court finds that it is not credible that Coppola now recalls a specific intent, contrary to her written

documentation, that the parties intended or agreed to change the 50,000 net dry ton MMQ as understood in the 2008 Agreement. Rather, her documentation supports the finding that the parties intended that the MMQ was not changed, and only the method of determining acceptable fluctuations had been changed by the 2012 Agreement.

120. The Court finds that the greater weight of the evidence proves that neither CTG nor DEP intended to change the MMQ to the variable quantity term DEP now promotes in the litigation. Rather, the greater weight of the evidence leads the Court to find that both CTG and DEP intended and agreed to carry forward the MMQ of 50,000 net dry tons of Gypsum Filter Cake, as stated in the 2004 Agreement and the 2008 Agreement. As was the case when entering the 2008 Agreement, the parties intended this MMQ to apply for the entire term of the 2012 Agreement, although the language failed to expressly define a supply quantity for the entire contract term.

121. Based on the greater weight of the evidence, the Court further finds that the parties intended and agreed that Section 3.1, as modified in the 2012 Agreement, provides two separate clauses for determining acceptable fluctuations connected with the word "and," so that both clauses must be met in order for a fluctuation from the MMQ to be acceptable. Accordingly, the parties intended and agreed that their supply or acceptance obligations would be satisfied if DEP supplied and CTG accepted (1) an average monthly quantity of 50,000 net dry tons (essentially 600,000 net dry tons per year) or the aggregate actual production from the Roxboro Plant and Mayo

Plant over a twelve-month period, "whichever is less," and (2) the monthly quantity delivered and accepted does not vary more than 10% (up or down) from 50,000 net dry tons. Read together, these phrases provide that throughout the term of the 2012 Agreement, unless otherwise excused, DEP must supply and CTG must accept between 45,000 and 55,000 net dry tons per month and 540,000 and 600,000 net dry tons of Gypsum Filter Cake over a twelve-month period.

(d)     The Parties' Performance between 2012–2016

122.   The Court has not relied upon evidence of the parties' performance after executing the 2012 Agreement to determine the intent of the parties when entering that agreement. However, having heard the evidence presented, the Court finds that the parties' performance under the 2012 Agreement is consistent with the Court's finding that, when entering the 2012 Agreement, the parties intended and agreed for the MMQ to be 50,000 net dry tons for the entire 2012 Term as it had been for earlier agreements.

123.   The CTG Plant became operational on March 28, 2012, initially running only one shift for the first month. The CTG Plant gradually increased its production—operating two shifts between May 2012 and October 2012, then increasing to three shifts in October 2012. Ultimately, the CTG Plant began operating four shifts and running at full capacity in April 2013.

124.   CTG increased its acceptance of Gypsum Filter Cake from 2012 through 2014, but was still not regularly accepting 50,000 net dry tons per month. (Factual Stipulations, Ex. 1.) From March 2012 through July 2015, over two years after the

CTG Plant became fully operational, CTG had only accepted as much as 45,000 net dry tons of Gypsum Filter Cake during three months. (Factual Stipulations, Ex. 1.)

125. John Halm ("Halm"), a byproducts marketing manager for DEP, became responsible for managing and administrating the 2012 Agreement on behalf of DEP around October 2012. At that time, Halm administered the 2012 Agreement based on his understanding that DEP had an obligation to supply, and CTG had an obligation to accept, 50,000 net dry tons of Gypsum Filter Cake per month, subject to allowable fluctuations. Although Coppola's construction of the 2012 Agreement would require calculating DEP's rolling twelve-month average production at its Roxboro Plant and Mayo Plant each month, Coppola did not instruct Halm of this need.

126. Halm reported to Tony Mathis ("Mathis"), the manager of DEP's byproducts team. Beginning in 2015, Mathis reported to Brian Weisker ("Weisker"), Vice President of Coal Combustion Products Operations & Maintenance. Documents reflect that at least until they consulted with counsel in January 2017, Halm, Mathis, and Weisker, who were not involved in any negotiation leading to the 2012 Agreement, all understood, based on their reading of the agreement, that the MMQ under the 2012 Agreement was 50,000 net dry tons per month. (*See* Exs. 31, 32, 113, 114.) Both Halm's and Weisker's testimony at trial was consistent with the documentation.

127. Although the evidence is that CTG did not regularly accept 50,000 net dry tons (plus or minus 10%) between March 2012 and July 2015, there is no evidence

that DEP demanded that CTG do so. Nevertheless, DEP continued to represent that the MMQ was 50,000 net dry tons per month, informing CTG that DEP did not want CTG to discontinue its support for third-party sales until the Stockpile fell below 600,000 net dry tons and CTG was regularly accepting 50,000 tons per month. (*See* Ex. 130.)

128. In January 2016, Halm prepared a written summary of the 2012 Agreement reflecting his understanding that DEP was contractually obligated to supply 600,000 tons of synthetic gypsum per year and that DEP would be required to purchase synthetic gypsum from another source if the production at DEP's Roxboro Plant and Mayo Plant was not adequate to satisfy the MMQ. (*See* Ex. 31, at 3.) Halm noted that while CTG has actually required lesser amounts, he projected that DEP faced a future production shortage that would not meet the MMQ.

129. In January 2017, Weisker prepared a summary of the CTG contract and provided it to his superior, George Hamrick, Vice President of Coal Combustion Products. Weisker's summary acknowledged that DEP had a supply obligation of 600,000 tons per year that would require DEP to secure an alternative source of synthetic gypsum should its Roxboro Plant and Mayo Plant production be inadequate. (Ex. 113, at 1.)

130. Halm and Weisker testified that they changed their understanding regarding the MMQ after consulting counsel.

131. Between 2012 and early 2017, DEP never tracked or calculated the rolling twelve-month average of production at the Roxboro Plant and Mayo Plant.

April 6, 2017, was the first time Halm calculated the twelve-month rolling average to determine the MMQ.

132. The Court finds that the understanding that Halm and Weisker had before consulting counsel, and the management steps they took consistent with that understanding, were fully consistent with the Court's determination of the parties' understanding, agreement, and intent with regard to the MMQ at the time they executed the 2012 Agreement.

(e)    Source of Supply of Gypsum Filter Cake to Satisfy Section 3.1

133. DEP contends that the MMQ must be read narrowly so as to limit its obligation to supply Gypsum Filter Cake to only supplying its production at the Roxboro Plant and Mayo Plant, whether or not that amount is less than the MMQ as the Court has found it to be defined by the 2012 Agreement.

134. The 2004 Agreement defined Gypsum Filter Cake as "a filter cake of calcium sulfate dehydrate, being a byproduct of the FGD Systems, which conforms to the Specifications." (Ex. 5 § 1.17.) FGD Systems were designated as "the Flue Gas Desulfurization system(s) to be installed, owned (in whole or in part) and operated by [DEP] at the Mayo and Roxboro Plants." (Ex. 5 § 1.14.)

135. DEP contends that these definitions, read together and considered in the context of the overall structure of the 2004 Agreement, demonstrate that the parties agreed that DEP was only obligated to supply synthetic gypsum produced from the FGD Systems at the Roxboro Plant and Mayo Plant.

136. The Court finds that such a narrow reading is inconsistent with other provisions adopted in the 2004 Agreement and carried forward in the 2008 Agreement and the 2012 Agreement. The parties repeatedly use the defined term "Gypsum Filter Cake" in a manner that makes clear that the reference must be to synthetic gypsum produced at locations other than the Roxboro Plant and Mayo Plant. (Ex. 15 §§ 3.8, 6.2.) The parties have consistently and repeatedly agreed that "[DEP's] expectation is to supply Gypsum Filter Cake *primarily* from the Roxboro and Mayo Plants, but retains the *right to supply Gypsum Filter Cake from any source.*") (Ex. 5 § 3.1; *see* Ex. 6 § 3.1; Ex. 15 § 3.1) (emphases added).) It is manifestly obvious that DEP could not obtain Gypsum Filter Cake from any source other than its Roxboro Plant and Mayo Plant if by definition any Gypsum Filter Cake must have been produced only at the Roxboro Plant or Mayo Plant.

137. The Court finds that the parties understood, intended, and agreed when entering into each of the Supply Agreements, that although DEP expected to supply synthetic gypsum primarily from its Roxboro Plant and Mayo Plant, it might be required to supply from other sources if necessary. DEP's pre-litigation course of action is fully consistent with their having so agreed.

(2) **Section 2.2.3 Regarding the Stockpile**

138. The Supply Agreements have consistently agreed that DEP would build and thereafter maintain a storage area on its property to store Gypsum Filter Cake at its Roxboro Plant. (*See* Ex. 5 § 2.2; Ex. 6 § 2.2.3(a); Ex. 15 § 2.2.3(a).) Before the CTG Plant was operational, DEP stored much of its production in the Stockpile, but

required CTG to remove amounts necessary to keep the Stockpile within a safe volume. The Supply Agreements contemplated that on an ongoing basis, so long as the Stockpile was within an acceptable volume, DEP may add Excess Gypsum to the Stockpile. (Ex. 5 § 1.12; Ex. 6 § 1.15; Ex. 15 § 1.21; *see* Ex. 5 § 2.2; Ex. 6 § 2.2.3(a); Ex. 15 § 2.2.3(a).)

139. The 2012 Agreement contains the following Section 2.2.3(a):

> [DEP] and CertainTeed have worked together to build a Gypsum Filter Cake stockpile (the **"Stockpile"**) in the [DEP] Gypsum Storage Area. [DEP] will use *commercially reasonable efforts* to maintain at least 250,000 Net Dry Tons of Gypsum Filter Cake in the Stockpile at all times during the Term of this Revised Agreement. If the volume in the Stockpile falls below 250,000 Net Dry Tons, [*DEP*] *will be deemed to be using commercially reasonable efforts to maintain the required volume in the Stockpile as set forth herein to the extent that [DEP's] monthly production of Gypsum Filter Cake is used to fulfill its Minimum Monthly Requirement obligations as set forth herein, and (a) the Excess Gypsum is being utilized to replenish the Stockpile, or (b) to the extent otherwise agreed by the Operating Plan as provided below.* If at any time during the Term of this Revised Agreement the Stockpile falls below 250,000 Net Dry Tons or [DEP] has reason to believe that the Stockpile will fall below 250,000 Net Dry Tons for any reason . . . then (unless otherwise previously provided to CertainTeed) [*DEP] will provide a replenishment plan (the* **"Replenishment Plan"***) to CertainTeed to establish a plan to rebuild the volume in the Stockpile to 250,000 Net Dry Tons.*

(Ex. 15 § 2.2.3(a) (italics added).)

140. There is no evidence that the parties ever prepared the Operating Plan referred to in this section.

141. Section 2.2.3(b) details that CTG has responsibility for maintaining the conveyor that is used to transport materials from the Stockpile for delivery to the

CTG Plant and that CTG cannot allow the Stockpile to exceed 600,000 net dry tons of Gypsum Filter Cake, referred to as "the Storage Maximum." (Ex. 15 § 2.2.3(b).) Section 2.2.3(b) concludes with the following:

> For the avoidance of doubt, [DEP] will be deemed to have met its obligation hereunder to deliver its [MMQ] to the extent that [DEP] has delivered at least an aggregate total quantity of Gypsum Filter Cake at least equal to the [MMQ] (i) directly to the [CTG Plant] via the Gypsum Conveyor System, (ii) and/or to the [DEP] Gypsum Storage Area, and/or (iii) directly to the [CTG Plant] by truck if mutually agreed upon.

(Ex. 15 § 2.2.3(b).)

142. CTG contends that: (a) DEP is required to utilize commercially reasonable efforts to maintain the Stockpile at 250,000 Net Dry Tons of Gypsum Filter Cake; (b) DEP has failed to do so because it failed deliver the contractually required MMQ; (c) now that the Stockpile volume has fallen below 250,000 net dry tons, DEP is contractually obligated to produce a Replenishment Plan; and (d) the Replenishment Plan DEP has provided to date does not meet DEP's contractual obligation because it is not based on DEP's obligation to supply the MMQ throughout the term of the 2012 Agreement and seeks to impose on CTG the cost of now securing the volume necessary to replenish the Stockpile because of DEP's failures to supply the MMQ. (*See* Am. Compl. ¶¶ 102–03.)

143. DEP's contention revolves around its proposed definition of the MMQ. DEP contends that it has complied with its obligations under Section 2.2.3 because: (a) it has at all material times either delivered its entire production to CTG or added it to the Stockpile, and (b) it provided CTG with a Replenishment Plan, which DEP has followed. (*See* Ex. 54.)

144. The Court finds Section 2.2.3 of the 2012 Agreement to be ambiguous, requiring the Court to consider extrinsic evidence to determine the intent of the parties when entering the 2012 Agreement. The extrinsic evidence includes the drafting history of provisions regarding the Stockpile. The initial 2004 Agreement included a provision that DEP would "build and use reasonable efforts to maintain a 300,000 Net Dry Ton Gypsum Filter Cake [S]tockpile in the [DEP] Storage Area" and thereafter either dispose of Excess Gypsum or add it to the Stockpile. (Ex. 5 § 2.2.)

145. The 2008 Agreement reduced the minimum volume of the Stockpile to 250,000 Net Dry Tons of Gypsum Filter Cake, modified DEP's obligations from "reasonable efforts" to "commercially reasonable efforts," and added the requirement that DEP provide a Replenishment Plan if the Stockpile volume fell below 250,000 Net Dry Tons. (Ex. 6 § 2.2.3(a).) The parties also agreed in the 2008 Agreement that DEP, primarily at CTG's expense, would increase the Stockpile's storage capacity to 650,000 Net Dry Tons. (*See* Ex. 6 § 2.2.3(b).)

146. Section 2.2.3(a) of the 2012 Agreement closely tracked the section as it had been worded in the 2008 Agreement. DEP rejected Engelhardt's proposal that would have modified Section 2.2.3 to provide a Stockpile Buffer, which would guarantee that the Stockpile volume not be outside defined minimum and maximum volumes. (*See* Ex. 26 § 2.2.39(c).)

147. The parties presented little testimony regarding the specifics of the negotiations of the Stockpile provisions other than their testimony regarding Engelhardt's rejected proposal for the Stockpile Buffer.

148. The Court finds that, at the time they entered into the 2012 Agreement, the parties understood, intended, and agreed that: (a) DEP was required to exercise commercially reasonable efforts to maintain the Stockpile at a volume of at least 250,000 net dry tons of Gypsum Filter Cake; (b) DEP would be deemed to be using commercially reasonable efforts so long as it delivered the MMQ, unless otherwise excused, in the amount defined by Section 3.1 as the Court has found it to be and delivered in the manner defined by Section 2.2.3(b) of the 2012 Agreement; and (c) if DEP expected that the volume in the Stockpile would fall or had fallen below 250,000 net dry tons, it was required to prepare and provide to CTG a Replenishment Plan to rebuild the Stockpile.

149. It is undisputed that, at the time of trial, the Stockpile contained less than 250,000 tons of Gypsum Filter Cake. It is also undisputed that at all times since April 2017, when CTG and DEP's disagreement regarding the definition of the MMQ became apparent, DEP has used its entire production of synthetic gypsum at the Roxboro Plant and Mayo Plant either to deliver Gypsum Filter Cake to CTG or to add to the Stockpile.

150. On March 9, 2017, Weisker, on behalf of DEP, sent a letter to CTG informing it that the Stockpile would fall below 250,000 tons and that DEP was developing a Replenishment Plan. (Ex. 138.) DEP then prepared, and on July 25, 2017, supplied to CTG, a Replenishment Plan based on DEP's interpretation of the MMQ that it has promoted in this litigation, and which the Court has rejected. (*See* Ex. 54.)

151. While DEP has delivered Gypsum Filter Cake as its Replenishment Plan calls for, DEP has not, during the period after that Replenishment Plan was provided to CTG, consistently delivered the MMQ as the Court has found it to be. The evidence is clear that at least for certain months in 2017, after CTG timely demanded performance, DEP failed to deliver the MMQ as the Court has defined it to be for the 2012 Agreement. Accordingly, at least for those months, DEP has failed to use commercially reasonable efforts as defined by Section 2.2.3(a).

152. DEP has breached the 2012 Agreement by failing to prepare a Replenishment Plan consistent with this Opinion & Final Judgment and based on the MMQ as the Court has found it to be.

### (3) DEP's Defense Based on Section 3.9 and the Doctrine of Impossibility

153. DEP contends that any performance obligation it may have undertaken in the 2012 Agreement is now excused by Section 3.9 of the 2012 Agreement, no matter what the Court determines the MMQ to be, because its further supply of Gypsum Filter Cake based on the 2012 Agreement terms and requirements is inconsistent with its Primary Purpose as a regulated utility. DEP relies on Section 3.9 of the 2012 Agreement, which reads:

> Primary [DEP] Duty. CertainTeed acknowledges and agrees that [DEP's] obligations hereunder are subject to [DEP's] overriding and primary duty to produce economical and reliable electric power for public consumption in accordance with federal, state[,] and local laws and regulations (the **"Primary Purpose"**) and nothing in this Revised Agreement shall, in any way, be interpreted or constructed so as to obligate [DEP] to attempt to maximize its production of synthetic gypsum, including without limitation, Gypsum Filter Cake and/or to operate any one or more of it Units and/or the FGD Systems and/or to

> change any of its processes in order to produce such synthetic gypsum or Gypsum Filter Cake at all or of a particular quality and/or form.

(Ex. 15 § 3.9; *see also* Ex. 6 § 3.9 (emphasis in original).)

154. CTG contends that all of the language of Section 3.9 must be read together and, when so read, Section 3.9 makes clear that DEP has no obligation to *produce* synthetic gypsum at the Roxboro Plant, Mayo Plant, or otherwise, but it does not excuse DEP from *supplying* Gypsum Filter Cake from whatever source is necessary to meet DEP's contractual obligation.

155. DEP contends that the language in Section 3.9 reflects two related but separate principles: first, that all of DEP's obligations under the 2012 Agreement are subservient to DEP's Primary Purpose, as expressed in the first clause in Section 3.9; and second, that the 2012 Agreement cannot be construed to compel DEP to "maximize its production of synthetic gypsum" to meet its supply obligation, as expressed in the second clause of Section 3.9. (*See* Ex. 15 § 3.9; *see also* Ex. 6 § 3.9.) DEP contends that the first clause expressing DEP's Primary Purpose has independent broad application adequate to excuse its further supply obligation.

156. As to Section 3.9, the Court has been able to determine the intent of the parties when they entered the 2012 Agreement based on that section's plain language. Section 3.9 clearly affirmatively represents, and reflects that CTG acknowledges, that DEP is a regulated utility company that must supply economical and reliable electricity consistent with law and regulations. (*See* Ex. 15 § 3.9.) Section 3.9 also clearly precludes CTG from demanding that DEP itself produce or maximize production of synthetic gypsum or Gypsum Filter Cake in any amount. It

does not follow that DEP is excused from its contractual supply obligation if complying with that obligation does not conflict with laws or regulations. If laws or regulations prohibit DEP from supplying Gypsum Filter Cake, an excuse afforded by Section 3.9 does not depend on whether DEP is producing Gypsum Filter Cake in any amount or at all. If no laws or regulations prohibit supplying Gypsum Filter Cake, DEP's supply obligation is not excused by Section 3.9, regardless of the amount of Gypsum Filter Cake DEP may be producing, if any.

157. There was no law or regulation restricting DEP's supply of Gypsum Filter Cake when the parties entered the 2012 Agreement. The Court finds, based on the plain language of Section 3.9, that the parties intended and agreed that Section 3.9 would excuse DEP from its obligation to supply synthetic gypsum if future changes in laws or regulations restrict DEP from supplying synthetic gypsum, but did not intend or agree that DEP would be excused if it could continue to lawfully supply its obligation, even if the expense of doing so increased to an unanticipated degree. DEP undertook an obligation to supply Gypsum Filter Cake, secured a contractual protection that its supply can come from alternate sources, and has offered no proof of any law or regulation that prohibits its supplying Gypsum Filter Cake. Experts for both parties agree there is no such law or regulation.

158. The Court must also read Section 3.9 in harmony with other provisions of the 2012 Agreement. Each of the Supply Agreements have included a force majeure article ("Force Majeure Article") that expressly provides that certain specific events will excuse either DEP's or CTG's performance obligations. Section 3.9

contains no similar express language. The Court finds no implied excuse arising from CTG's recognition that DEP's obligations are "subject to [DEP's] overriding and primary duty to produce economical and reliable electric power for public consumption in accordance with federal, state[,] and local laws." (Ex. 15 § 3.9.) The Court finds that Section 3.9 was not intended to provide that DEP could escape its supply obligations because changed circumstances may affect the economies of that supply. The Court concludes that the parties intended and agreed that any such changed circumstances, other than changes in law or regulation, would be addressed through the 2012 Agreement's remedy provisions in Article 6.

159. In sum, the Court reads the plain language of Section 3.9 to excuse DEP from its obligation to supply Gypsum Filter Cake only if it could no longer legally supply Gypsum Filter Cake. Section 3.9 does not support DEP's contention that it is no longer obligated to perform its supply obligation under the 2012 Agreement.

160. The Court has been able to determine the intent and meaning of Section 3.9 without resort to extrinsic evidence. However, the Court finds from the extrinsic evidence that it is fully consistent with the meaning the Court has determined from the plain contractual language.

(a) Negotiating and Drafting Section 3.9

161. Section 3.9 appeared for the first time during the drafting of the 2008 Agreement. Coppola, Mottola, and Morrow testified about the negotiations of the 2008 Agreement. Mottola and Coppola both testified that DEP considered Section

3.9 to be very important and non-negotiable. Morrow acknowledged that Section 3.9 was a new term, but he did not think it impacted the parties' performance obligations.

162. Coppola sent DEP's initial draft of the 2008 Agreement, which included Section 3.9, to CTG on November 22, 2007. (*See* Ex. 10.) Morrow sent a redlined draft back to Coppola on January 21, 2008, which included a comment immediately following Section 3.9 that stated—"This section is new. While the principle is probably acceptable, we will need to be careful that it does not upset [DEP's] minimum delivery obligations under the Agreement." (Ex. 10 § 3.9.) The evidence does not make clear who authored this comment, however, identifying the author is not critical to resolving the dispute between the parties because the Court's consideration of the comment is not a significant factor in its determination.

163. On February 14 and 15, 2008, the parties had a meeting to finalize the 2008 Agreement. After that meeting, Pam Larger, DEP's attorney, sent a working draft of the 2008 Agreement to CTG titled "Joint Discussion Draft." (Ex. 18.) DEP deleted the comment to Section 3.9 discussed above, but did not otherwise change the language of Section 3.9 from the earlier drafts. (*See* Ex. 18 § 3.9.) Neither Coppola nor Morrow recalled the specifics of any discussions about Section 3.9 during their February 2008 meeting.

164. Coppola testified that DEP intended Section 3.9 to provide it with broad protection, but she did not recall any specific discussions regarding Section 3.9. The Court finds Coppola's testimony to be significantly influenced by DEP's litigation position and is not persuaded that Coppola has any specific recollection of any

understanding between DEP and CTG as to the purpose and meaning of Section 3.9 other than what can be determined from its language alone.

165. Mottola testified to a more specific recollection of the contractual negotiations that led to the 2008 Agreement. The Court finds Mottola's overall testimony consistent with the Court's finding based on its plain reading of Section 3.9. Mottola explained that when negotiating the agreement, DEP could not predict what, if any, new laws or regulations might be enacted during the twenty-year contract term, thus it wanted protection from liability in the event that an unanticipated law or regulation prevented DEP from being able to supply Gypsum Filter Cake. Mottola acknowledged that DEP did not intend for Section 3.9 to excuse it from its performance obligations if a business decision or something unrelated to its compliance with a legal requirement impacted DEP's ability to supply Gypsum Filter Cake.

166. Mottola now offers his belief that DEP's compliance with the Least-Cost-Dispatch Requirement has resulted in DEP producing less synthetic gypsum at the Roxboro Plant and Mayo Plant, and that Section 3.9 excuses DEP's supply obligation. There is no evidence that, at the time the 2008 Agreement was entered, he or others contemplated or believed that such a scenario would excuse DEP's obligations to supply Gypsum Filter Cake.

167. Mottola recalls that Morrow expressed frustration with Section 3.9, believing that it might allow DEP to avoid its supply obligations, in response to which Mottola explained that DEP only intended for Section 3.9 to excuse it from its supply

obligation if there was a law or regulation that affected DEP's ability to supply Gypsum Filter Cake. Mottola admits that he never discussed with Morrow, or anyone else at CTG, that already-existing laws on the books could trigger Section 3.9.

168. Morrow did not recall any conversations with Mottola regarding Section 3.9 and testified that he understood Section 3.9 could not obligate DEP to produce synthetic gypsum, but that it did not affect DEP's obligation to supply Gypsum Filter Cake.

169. The Court finds that the greater weight of Mottola's testimony reflects the parties' intent at the time they executed the 2008 Agreement as the Court has found it to be.

170. The parties also offered evidence regarding negotiations of the Force Majeure Article, first adopted in the 2004 Agreement. During the drafting of the 2004 Agreement, Johnson added a paragraph to the Force Majeure Article that provided as follows:

> In construing and interpreting this Article 13 and other provisions of this Agreement, the parties shall recognize that the primary mission of the Roxboro Plant and the Mayo Plant shall be the safe production of electrical power on an economic basis [("Primary Mission")].

(Ex. 92 art. 13.) Johnson testified that he included this language because his managers instructed him to add it to the agreement but did not recall any further reason or discussion.

171. CTG deleted Johnson's proposed paragraph and provided a different paragraph that stated:

> In the event a change in a governmental law, rule or regulation, or an action or decision by [DEP], including without limitation, a decision to change fuel sources, affects the quality or quantity of Gypsum Filter Cake generated by [DEP] and [DEP] cannot meet its obligations under this Agreement, [CTG] shall have the remedies set forth in Sections 6.2 and 6.3 of this Agreement.

(Ex. 93 art. 13.)

172.    DEP rejected CTG's proposal and reinserted the "Primary Mission" paragraph, which CTG accepted.  Without further explanation from the parties, and in light of all other evidence, the Court finds that this proposed language and its omission from the final agreement neither supports nor detracts from the position of either party as to the meaning of Section 3.9 of the 2012 Agreement.

173.    Significantly, while Section 12.1 of the 2012 Agreement lists several events that may excuse performance, DEP's Primary Mission is referenced in the separate Section 12.4, which does not expressly provide for excused performance. (Ex. 15 §§ 12.1, 12.4.)  This distinction has been in place since the 2004 Agreement. (*See* Ex. 6 art. 12.)

174.    The language of Section 3.9 was carried forward in the 2012 Agreement without significant negotiation or modification.  There is no evidence that the parties intended to change the meaning or application of Section 3.9 when they executed the 2012 Agreement.

175.    In sum, the Court finds that should it have been necessary to resort to extrinsic evidence to determine the intent of the parties as to the meaning of Section 3.9 when they entered the 2012 Agreement, the greater weight of the evidence is

consistent with the finding the Court has made based on its plain reading of Section 3.9 of the 2012 Agreement.

(b) The Greater Weight of the Evidence Demonstrates that DEP's Supply Obligation is Neither Excused nor Impossible

176. Eric Grant ("Grant"), DEP's Vice President of Fuels and Systems Optimization, explained how DEP currently operates its various plants and implements the Joint Dispatch Agreement consistent with its effort to comply with the regulatory Least-Cost-Dispatch Requirement. Based on that testimony and supporting documentation, the Court finds that DEP has operated its plants, including the Roxboro Plant and Mayo Plant, consistent with the Least-Cost-Dispatch Requirement since entering the 2012 Agreement. The Court further finds that, because of a decline in natural gas prices, the Least-Cost-Dispatch Requirement has resulted in DEP reducing operations of its coal-fired units, including the Roxboro Plant and Mayo Plant, resulting in a reduction of DEP's production of synthetic gypsum.

177. Current forecasts predict that that Least-Cost-Dispatch Requirement will, at least for the foreseeable future, continue to require reduced operations at the Roxboro Plant and Mayo Plant with a consequent continued reduced production of Gypsum Filter Cake at those plants in amounts that are inadequate to meet DEP's supply obligation under the 2012 Agreement.

178. The evidence also demonstrates that DEP will likely continue to produce at least some quantities of Gypsum Filter Cake at other coal-fired plants, which either it or its affiliated companies operate.

179. The evidence does not allow any long-range prediction of how fuel prices may vary going forward, and how changes, if any, will impact plant utilization. It is then unclear how future changes in fuel prices may affect DEP's Economic Dispatch during the remaining term of the 2012 Agreement.

180. Evidence demonstrates that DEP has been able either to transport Gypsum Filter Cake from other plants or purchase it from affiliate companies. While there is evidence of significant expense necessary to transport Gypsum Filter Cake from alternative sources, there is no evidence supporting a finding that supplying Gypsum Filter Cake from other sources is now or expected to be impossible.

181. Both parties presented testimony from expert witnesses. CTG offered expert testimony from Ms. Gisele Rankin ("Rankin"), a former attorney on the public staff of the North Carolina Utilities Commission, who was accepted, without objection from DEP, as an expert on the subject of utility regulation in North Carolina. DEP offered expert testimony from Kim Smith ("Smith"), a Rates & Regulatory Strategy Director with Duke Energy, who was tendered, without objection from CTG, as an expert on the utilities laws, rules, and regulations that apply to DEP. Both Rankin and Smith agree that the decreased cost of natural gas has resulted in the Roxboro Plant and Mayo Plant falling lower in the Economic Dispatch order, and, as a result, the Roxboro Plant and Mayo Plant are producing less synthetic gypsum.

182. Rankin proffered that DEP's reduced production of synthetic gypsum is, in part, caused by its decision to enter into the Joint Dispatch Agreement with DEC. The Court finds this to be speculative, and that the more probative evidence from

Grant suggests that it is more likely that DEP has operated its coal-fired plants more frequently than it would have had it not entered the Joint Dispatch Agreement.

183.  Rankin and Smith both agree that there are no laws or regulations that prohibit DEP from purchasing synthetic gypsum from third parties or affiliates. Smith did not opine that DEP's obligation to supply Gypsum Filter Cake under the 2012 Agreement was inconsistent with DEP's Primary Purpose at the time it entered into that agreement.  To the contrary, she concurred that, although DEP is not in the business of brokering the supply of synthetic gypsum, synthetic gypsum is a byproduct with which DEP must deal, and it entered into the Supply Agreements to provide a beneficial reuse for that byproduct—an undertaking that was a part of, and consistent with, DEP's Primary Purpose of producing reliable and economical electricity.

184.  Rankin and Smith offered testimony regarding the potential as to whether the North Carolina Utilities Commission will allow DEP to recover any costs it may incur as a result of meeting its supply obligations under the 2012 Agreement. The Court finds it unnecessary to determine or opine on what the Commission might allow.

185.  Although there have been changes in the factual circumstances, the laws and regulations that defined DEP's Primary Purpose remain as they were when DEP executed the Supply Agreements.  The Least-Cost-Dispatch Requirement existed long before the parties executed the Supply Agreements.

186.   The Court finds that there has been no change of circumstance, either in fact or law, that prohibits or excuses DEP from supplying Gypsum Filter Cake pursuant to the 2012 Agreement.  The Court finds that Section 3.9 does not excuse DEP from meeting its supply obligation and that it is not impossible for DEP to meet its supply obligation as defined by the 2012 Agreement.

**(4)   Section 6.2 and Section 6.3—Remedies Available to CTG for DEP's Failure to Meet Supply Obligations**

187.   Since 2004, Article 6 in the Supply Agreements has included distinct paragraphs that define the parties' remedies as follows: (1) Defective Material; (2) Undersupply by [DEP] ("Section 6.2"); (3) Discontinued Supply by [DEP] ("Section 6.3"); (4) Under Acceptance by [CTG] ("Section 6.4"); and (5) Discontinued Acceptance by [CTG] ("Section 6.5").  (*See* Ex. 5 §§ 6.1–6.5; *see also* Ex. 6 §§ 6.1–6; Ex. 15 §§ 6.1–6.)  Section 9.4 of each of the Supply Agreements provides that "[w]here a remedy is specified in this Revised Agreement for a particular breach or occurrence, the remedy specified shall be the sole and exclusive remedy for the breach or occurrence, whether arising in contract, tort (including negligence), strict liability or otherwise."  (Ex. 5 § 9.4; Ex. 6 § 9.4; Ex. 15 § 9.4.)

188.   The parties both seek a declaratory judgment regarding the meaning and interpretation of Section 6.3, and specifically whether it becomes CTG's exclusive remedy once it is triggered by certain actions taken by DEP.  Section 6.3 provides that once DEP takes certain actions, CTG may terminate the 2012 Agreement and recover liquidated damages.  While the parties agree that DEP has not yet taken the

actions that may trigger Section 6.3, they agree that their dispute as to the Section's meaning is of immediate importance and justifies the Court's declaration.

189. The primary dispute regarding remedies is this: DEP contends that once triggered, CTG's termination remedy is exclusive; CTG contends that it continues throughout the 2012 Agreement to have an election between termination and specific performance. Stated otherwise, DEP contends that if there are acts that constitute a "discontinued supply," in contrast to an "undersupply," then termination with liquidated damages is CTG's sole remedy. CTG contends that a "discontinued supply" is only a variant of an "undersupply," and the remedies for the two are not mutually exclusive.

190. Section 6.2 of the 2012 Agreement, titled "Undersupply by [DEP]," provides in significant part that

> [s]ubject to the quantity variations permitted under Section 2.2 and 3.1, in the event [DEP] is unable to deliver to [CTG] the [MMQ] in any month during the term of this Revised Agreement and such failure is not excused under the terms and conditions of this Revised Agreement, [CTG] may, at its election, by written notice to [DEP] within thirty (30) days after the end of the month in which the deficiency occurred, either (a) instruct [DEP] in writing to deliver within thirty (30) days at [DEP's] sole expense to the Point of Delivery the quantity of Gypsum Filter Cake necessary to satisfy the [MMQ], or (b) purchase on the open market on a commercially reasonable basis for delivery to the [CTG Plant], the amount of Gypsum Filter Cake necessary to satisfy the lesser of [CTG's] commercial requirements or the [MMQ].

(Ex. 15 § 6.2.) Section 6.2 further provided that CTG may recover the cover price in excess of the contract price. (Ex. 15 § 6.2.)

191. In net effect, Section 6.2 provides that, unless DEP's monthly supply obligation is excused, if DEP fails to deliver the MMQ for any month, then CTG, upon

proper notice, can either demand that DEP deliver the MMQ or obtain DEP's supply obligation on the market and recover its cover expenses. CTG waives its Section 6.2 remedy for any month in which it fails to provide timely written notice of default. (Ex. 15 § 6.2; *see also* Ex. 6 § 6.2.)

192. Section 6.3 of the 2012 Agreement, titled "Discontinued Supply by [DEP]," provides in significant part that

> [if DEP] (a) elects to discontinue altogether supplying Gypsum Filter Cake to CertainTeed; (b) takes any action that prevents or will prevent [DEP] from supplying at least fifty percent (50%) of the Minimum Monthly Quantity each month over a five (5) year period, or (c) takes any other action that causes [DEP] to supply 300,000 Net Dry Tons or less Gypsum Filter Cake per year in two (2) consecutive Contract Years, CertainTeed may terminate this Revised Agreement, and if this Revised Agreement is terminated pursuant to this Section, [DEP] shall pay to CertainTeed as liquidated damages upon written request annual payments for the remainder of the Initial Term . . . equal to the Minimum Monthly Quantity multiplied by the current price of Gypsum Filter Cake then in effect under this Revised Agreement plus [an agreed-upon dollar amount], multiplied by the number of months in that year remaining in this Revised Agreement.

(Ex. 15 § 6.3.) The Court will refer to the three actions specified by Section 6.3 as "Discontinuance Events."

193. Sections 6.4 and 6.5 respectively provide DEP remedies for CTG's "under acceptance" and for CTG's "discontinued acceptance." Section 6.4 provides that, for any month in which CTG fails to accept the MMQ, DEP may recover the cost incurred to dispose of any amount of the MMQ that CTG does not accept. (*See* Ex. 15 § 6.4.) Section 6.5 provides that DEP may terminate the 2012 Agreement if CTG takes action defined as discontinued acceptance. If terminating on this basis, DEP has the election between recovering liquidated damages or requiring CTG to transfer

title to the CTG Plant along with the facilities and intellectual property necessary to operate the plant. (Ex. 15 § 6.5.)

194. Having considered the parties' positions, the Court finds that Section 6.2 and Section 6.3 are ambiguous, requiring the Court to consider extrinsic events to determine the parties' intent when entering the 2012 Agreement.

(a) Drafting History

195. The relevant provisions of Article 6 were first negotiated and agreed to in the 2004 Agreement. The parties then carried forward the remedies sections from the 2004 Agreement to the 2008 Agreement and then again to the 2012 Agreement without significant negotiation or modification.[2] Although some witnesses involved in the negotiations of the 2008 Agreement generally recalled discussions about the remedies provisions, there is no dispute that Article 6 remained substantially unchanged after the parties executed the 2004 Agreement and carried it forward through the 2008 Agreement, and eventually to the 2012 Agreement.

196. CTG prepared the first draft agreement that began the negotiation process that led to the 2004 Agreement. College sent Johnson the first draft of a proposed agreement on May 12, 2003. (*See* Ex. 90.) This draft included remedies for CTG but did not provide remedies for DEP. (*See* Ex. 90 art. 6.) In this draft, CTG drafted two separate untitled paragraphs under the general heading "Remedies for

---

[2] The only substantial changes to Section 6.2 and Section 6.3 from the 2004 Agreement to the 2012 Agreement are that Section 6.3 in the 2012 Agreement is no longer triggered by DEP failing to build its FGD Systems, (*see* Ex. 5 § 6.3(a)), and the language of 6.2 was modified to reflect the changes made to Section 3.1 in the 2008 Agreement to eliminate the Start-Up Period. (*Compare* Ex. 5 5 § 6.2, *with* Ex. 15 § 6.2.) These changes do not affect the current dispute as to whether the Section 6.3 remedy is exclusive once triggered.

[CTG]." (Ex. 90 § 6.1.) Section 6.1(a) provided that if DEP failed to deliver the MMQ in any given month, then CTG could, on a month-to-month basis, either demand that DEP deliver the MMQ or make purchases on the open market and recover its cover expenses from DEP. (Ex. 90 § 6.1(a); *see also* Ex. 91 § 6.2(a).) Section 6.1(b) addressed specific actions taken by DEP that would materially interrupt DEP's supply over a sustained period, and specified that DEP was required to give two years' advance notice prior to taking such action, and thereafter pay CTG liquidated damages. (Ex. 90 § 6.1(b); *see also* Ex. 91 § 6.2(b).)

197. CTG's initial draft included a provision that the remedies in Article 6 "are, and shall be the sole and exclusive remedies for [CTG] with respect to the subject matter contained therein." (Ex. 90 § 6.2.)

198. Although the wording later changed, CTG's concept of distinct remedies for a short-term monthly undersupply and a long-term disruption of supply became the structure around which the final Article 6 was drafted. CTG's initial draft provisions were the foundation of what became the final Article 6, as well as Section 9.4.

199. DEP provided no written draft in response to CTG's initial draft. CTG's counsel, Mark Lontchar, edited the initial draft that College sent Johnson on May 27, 2003. (*See* Ex. 91.) This revised draft added remedies for DEP while not changing CTG's remedies, and modified the exclusive remedies provision to make it applicable to both DEP and CTG. (*See* Ex. 91 §§ 6.1, 6.2.)

200.    Johnson sent DEP's markup of CTG's second draft to College on July 24, 2003 ("July 2003 Draft").  (*See* Ex. 92.)  The July 2003 Draft introduced the headings of "Undersupply by [DEP]," "Discontinued Supply by [DEP]," "Under Acceptance by [CTG]," and "Discontinued Acceptance by [CTG]" that were ultimately included in Article 6 of the 2004 Agreement and added the exclusive remedies provision that became Section 9.4.  (Ex. 92 §§ 6.2–6.5, 10.3; *see* Ex. 5 §§ 6.2–6.5, 9.4.)

201.    DEP deleted CTG's proposed language that would require DEP to provide two years' advance notice of action that would lead to a discontinued supply. CTG did not later propose an alternative advance notice requirement.

202.    Johnson testified that DEP separated CTG's remedies for DEP's non-performance into two sections because DEP believed that undersupply and discontinued supply were two separate events that required different remedies. Likewise, DEP separated remedies for CTG's under-acceptance and discontinued acceptance into two distinct sections.  (*See* Ex. 92 §§ 6.4–6.5.)

203.    Mayer and Johnson both testified that they discussed the types of short-term operational issues that would possibly trigger Section 6.2, including routine maintenance and equipment failure.  Johnson explained that DEP intended Section 6.2 to be the sole remedy for non-recurring, short-term events and Section 6.3 to be the sole remedy for long-term, forward-looking events that led DEP to decide to either discontinue supplying Gypsum Filter Cake or take an action that would severely hinder its ability to supply Gypsum Filter Cake.

204. Mayer agreed that the parties intended Section 6.2 to address short-term variations in supply caused by business-operational issues. He testified that Section 6.3 was intended to address a decision by DEP to either completely cut off supply of Gypsum Filter Cake or that resulted in a substantial interruption in DEP's ability to supply Gypsum Filter Cake.

205. The Court finds that the greater weight of the testimony and documentary evidence is that Mayer and Johnson both recognized a distinction between short-term failures in supply or acceptance caused by events that could be remedied quickly, and long-term business decisions by either CTG or DEP that would cause long-term disruptions in either CTG's ability to accept or DEP's ability to supply synthetic gypsum, and that Mayer and Johnson intended to draft remedies that recognized this distinction.

206. On August 25, 2003, CTG sent DEP a draft that added the words "continuously" and "may terminate" into Section 6.3, stating "[i]n the event DEP. . . (ii) takes any action that materially and substantially diminishes [DEP's] ability to *continuously* supply Gypsum Filter Cake in sufficient quantities to meet the [MMQ] . . . [CTG] *may terminate this Agreement* and [DEP] shall pay to [CTG] . . . a termination fee . . . ." (Ex. 93 § 6.3 (emphasis added).) Ultimately, when adopted, both Section 6.3 and Section 6.5 provided that the party "may terminate" rather than providing the termination was automatic. While the term "continuously" was not expressly incorporated into Section 6.3 and Section 6.5, at least some of the events

described in these sections addressed disruptions in supply or acceptance that continue over a significant period. (Ex. 5 §§ 6.3, 6.5.)

207. Mayer testified that CTG proposed the word "continuously" to emphasize that the actions that would trigger Section 6.3 "represented an extreme condition of undersupply." (Tr. 341:2–3; *see also* Tr. 340:24–341:7.) Mayer testified that the "may terminate" language was added to Section 6.3 to clarify that CTG has the option but not the obligation to terminate under Section 6.3. (Tr. 341:11–13; Ex. 93 § 6.3; Ex. 97 § 6.3.) Mayer testified that CTG wanted the flexibility "to continue running the plant and seek gypsum from [DEP] instead of terminating." (Tr. 307: 17–18.) Johnson understood that the intent of this modification was to provide that the termination remedies were not self-executing, but rather would require the non-defaulting party to take an action to trigger the termination remedy.

208. Mayer further testified to his current view that, at the time the parties executed the 2004 Agreement, he believed that if CTG elected not to terminate the agreement under Section 6.3, then CTG could continue to invoke its remedies under Section 6.2 throughout the remaining term of the 2012 Agreement, even after events triggering Section 6.3 occurred. He offered the position CTG has advanced in the litigation that the triggering events of Section 6.3 are also an undersupply within the meaning of Section 6.2, so that CTG should have remedies under both provisions for the entire contract term. Johnson testified to the opposite and indicated that DEP would not have agreed to such a result. There is no testimony or documentary evidence that indicates that either Mayer, Johnson, or others involved in the

negotiation of the 2004 Agreement ever discussed a belief that the "may terminate" language CTG proposed was intend to allow CTG to elect between a termination for a discontinued supply or a specific performance remedy for a continuing undersupply.

209. The greater weight of the evidence is that both parties intended specific and separate remedies for the separate and distinct events of undersupply or under acceptance on the one hand, and discontinued supply or discontinued acceptance on the other hand, and that once the remedy of termination with liquidated damages was triggered by DEP's taking action defined by Section 6.3, that remedy became CTG's exclusive remedy of the breach of discontinuing supply. The Court further finds from the greater weight of the evidence that until the Discontinuance Events occur, CTG may enforce its remedy under Section 6.2 for those months in which DEP has failed to supply the contractual MMQ, and although Section 6.3 becomes exclusive when triggered, that exclusive remedy does not retroactively extinguish remedies CTG had under Section 6.2.

210. The Court finds that the parties intended that the termination remedy would not be mandatory. As Mayer testified, CTG intended to provide CTG an opportunity to assess its options once events triggered a potential termination. The Court finds that the parties understood that, while termination was not mandatory upon a Discontinuance Event, they did understand and agree that a Discontinuance Event would afford the non-defaulting party a right to terminate and would displace all other remedies for that discontinuance, including any right to demand specific performance as to earlier defaults from month to month.

211. The Court therefore finds that CTG's assertion that it will have a continuing right to exercise Section 6.2 remedies throughout the remaining term of the 2012 Agreement even if DEP takes action that constitutes a Discontinuance Event is not supported by, and is inconsistent with, the greater weight of the evidence as to the intent of the parties both at the time the 2004 Agreement was negotiated and at all times thereafter, including when entering the 2012 Agreement.

212. The Court finds that the parties recognized when drafting the remedies under Article 6 of the 2004 Agreement, that they were entering into a prospective twenty-year agreement with uncertain risks, and that, during the course of the term of that agreement, circumstances might compel either party to discontinue its performance. The parties did not agree or intend to preclude such a discontinuance, but provided that any such discontinuance would expose the defaulting party to termination and liquidated damages determined pursuant to a formula first adopted in the 2004 Agreement and carried forward in the 2008 Agreement and the 2012 Agreement.

213. The Court's findings are consistent with the manner and reason that CTG proposed adding the "may" language to Section 6.3. The Court finds that there is no evidence to support CTG's position that adding "may" in Section 6.3 was intended to provide CTG with the right to elect between the remedies provided in Section 6.2 and Section 6.3 throughout the 2012 Term.

214. In sum, the Court finds that the parties intended, understood, and agreed that if DEP takes an action defined as a Discontinuance Event under Section

6.3 of the 2012 Agreement, Section 6.3 will then provide CTG's sole remedy, but until DEP takes such an action, CTG can pursue its remedies under Section 6.2 on a month-to-month basis for any DEP short-term undersupply that is not otherwise excused.

**G.** **CTG is Entitled to Recover Under Section 6.2 for DEP's Breaches to Date that Have Not Been Waived**

215. In early 2017, Halm consulted legal counsel when he concluded that the Stockpile would fall below a volume of 250,000 net dry tons. After speaking with counsel, Halm changed his understanding regarding DEP's obligations to supply Gypsum Filter Cake under the 2012 Agreement.

216. CTG's and DEP's representatives met on April 5, 2017, and DEP advised CTG, for the first time, that it believed that the amendment to Section 3.1 in the 2012 Agreement had changed the MMQ to a variable quantity that could fall below 50,000 net dry tons per month based on DEP's production at its Roxboro Plant and Mayo Plant. There is no evidence that CTG was aware or had reason to believe prior to that meeting that DEP interpreted the MMQ in this manner, despite the fact that the amounts actually delivered or accepted under the 2012 Agreement had varied from month to month.

217. The evidence demonstrates that for a number of months after April 2017, DEP has not supplied the MMQ as the Court has found it to be under the 2012 Agreement.

218. The Court finds that DEP breached Section 3.1 of the 2012 Agreement by failing to deliver the MMQ, less acceptable fluctuations defined by Section 3.1, for

the months of May 2017, June 2017, and September 2017 through January 2018.  In those months, DEP based its delivery on its definition of the MMQ that the Court has rejected.  For each of those months, CTG provided the notice required by Section 6.2 and demanded that DEP deliver the deficient amount of Gypsum Filter Cake.  (*See* Ex. 115.)

219.    After notice, DEP did not deliver the shortfall between the MMQ and its actual delivery.

220.    CTG and DEP entered into an agreement whereby, for those months, DEP sold and delivered, and CTG purchased and accepted, Gypsum Filter Cake from alternative sources at prices that were in excess of the contract price pursuant to the MMQ, but in accordance with the price set for Other Gypsum as defined by the 2012 Agreement.  (*See* Ex. 15 § 3.6).  CTG reserved its right to recover what it contends were excess payments.

221.    DEP delivered Gypsum Filter Cake to CTG in May 2017, June 2017, and September 2017–January 2018 as follows:

| Month | Tonnage |
|---|---|
| May 2017 | 36,252.97 |
| June 2017 | 27,547.96 |
| September 2017 | 34,865.82 |
| October 2017 | 40,080.01 |
| November 2017 | 38,006.52 |
| December 2017 | 31,656.60 |

| January 2018 | 21,822.09 |

(*See* Factual Stipulations, Ex. 1.)

222. The Court finds that for these months, CTG was entitled to receive and DEP was obligated to deliver at the contract price the MMQ, less acceptable fluctuations as defined by Section 3.1. Because of DEP's supply failure, CTG failed to receive the entire MMQ.

223. Between May 2017 and January 2018, CTG purchased 59,925.17 net dry tons of synthetic gypsum from DEP directly or from its affiliate in order to supplement the volumes that DEP delivered, and paid greater than the MMQ contract price. (Factual Stipulations ¶¶ 4–12; *see also* Ex. 176.) The parties have stipulated as to the amount CTG paid in excess of the MMQ contract price.

## V. CONCLUSIONS OF LAW

224. Based on the foregoing Findings of Fact, the Court makes the following Conclusions of Law.

225. The Court has jurisdiction over the parties and the subject matter of this action.

226. The case was properly designated as a mandatory complex business case and assigned to the undersigned, who has authority to make Findings of Fact following the completion of the trial and the submission of all disputed issues for resolution by the Court without a jury.

227. Any Findings of Fact that are more appropriately deemed Conclusions of Law are incorporated by reference as the Court's Conclusions of Law.

228.   There is a real and existing controversy as to the terms and enforcement of the 2012 Agreement, and the Court's declaration is necessary to settle the legal rights and duties of the parties to the 2012 Agreement.

229.   The 2012 Agreement is a fully enforceable contract, and at the time the parties entered into the 2012 Agreement, they mutually agreed to all of its material and essential terms, including but not limited to Section 2.2.3, Section 3.1, Section 3.9, Section 6.2, Section 6.4, Section 9.4, and Section 12.4.

230.   When entering the 2012 Agreement, the parties were not mistaken as to any term of the 2012 Agreement, either as to law or fact, in any manner that renders any provision of the 2012 Agreement unenforceable, either by mutual or unilateral mistake, or a failure to agree.

231.   Although certain terms and provisions of the 2012 Agreement are ambiguous, the Court, considering extrinsic evidence where necessary, is able to discern the intent of the parties at the time they entered the 2012 Agreement.

232.   As to Section 3.9 of the 2012 Agreement, the Court concludes that its meaning can be determined from the plain language of the agreement.  Having considered the extrinsic evidence offered by the parties, the Court further concludes that the greater weight of that extrinsic evidence is consistent with the Court's finding based on Section 3.9's plain language.

233.   The Court concludes that the provisions of Sections 2.2.3, 3.1, 6.2, 6.3, and 9.4 of the 2012 Agreement are ambiguous and the Court cannot determine the meaning of these disputed sections from the plain language of the 2012 Agreement,

so that it is appropriate that the Court consider extrinsic evidence as to those sections to determine the intent of the parties when entering the 2012 Agreement.

234. Although the Court has considered only extrinsic evidence regarding negotiations prior to entering the 2012 Agreement to resolve any ambiguity as to the intent of the parties when entering the 2012 Agreement, after having heard evidence offered as to the course of performance from the time the parties entered the agreement to the time the litigation began, the Court finds that the greater weight of that evidence is consistent with the Court's interpretation of the disputed provisions of the 2012 Agreement, specifically its quantity term defined as the MMQ.

235. Based on the Findings of Fact stated above, the Court concludes, declares, and decrees that:

a. As used in the 2012 Agreement, the term MMQ means 50,000 Net Dry Tons of Gypsum Filter Cake;

b. Unless otherwise excused or extinguished, for the remainder of the 2012 Term, DEP is contractually obligated to supply and CTG is contractually obligated to accept the MMQ, subject to the minor fluctuations permitted under Section 3.1;

c. When entering the 2012 Agreement, the parties intended and agreed that their respective obligations to supply or accept Gypsum Filter Cake pursuant to Section 3.1 would be satisfied so long as (1) DEP delivered and CTG accepted between 45,000 to 55,000 net dry tons of Gypsum Filter Cake per month; and (2)

over a twelve-month period, DEP delivered and CTG accepted the lesser of 600,000 net dry tons of Gypsum Filter Cake or the aggregate actual production of synthetic gypsum at the Roxboro Plant and Mayo Plant, with the net effect that DEP was required to deliver and CTG was required to accept between 540,000 and 600,000 net dry tons of Gypsum Filter Cake over a twelve-month period;

d.  The definition of Gypsum Filter Cake as used in the 2012 Agreement is not limited to Gypsum Filter Cake produced at DEP's Roxboro Plant and Mayo Plant;

e.  When entering the 2012 Agreement, the parties intended and agreed that DEP may be required to meet its supply obligation by acquiring Gypsum Filter Cake from alternative sources if its production at its Roxboro Plant and Mayo Plant is not adequate to fulfill that obligation;

f.  Section 3.9 does not excuse DEP's supply obligation under the 2012 Agreement because DEP's further supply obligation is not inconsistent with its Primary Purpose;

g.  There is no current law or regulation that makes it unlawful for DEP to supply CTG with Gypsum Filter Cake from whatever source necessary;

h. DEP's supply obligation under the 2012 Agreement has not been excused by any Force Majeure;

i. It is not impossible for DEP to meet its supply obligation under the 2012 Agreement, and that supply obligation is not excused by the doctrine of impossibility;

j. DEP is required to use commercially reasonable efforts to maintain the Stockpile at 250,000 net dry tons of Gypsum Filter Cake;

k. If the Stockpile volume falls below 250,000 net dry tons, DEP will be deemed to be using commercially reasonable efforts if it (1) delivers the MMQ each month, as provided by Section 2.2.3(b) of the 2012 Agreement; and (2) places Excess Gypsum, if any, on the Stockpile until the volume is restored to 250,000 net dry tons;

l. The volume of the Stockpile has fallen below 250,000 net dry tons, obligating DEP to prepare and deliver to CTG a Replenishment Plan to restore the Stockpile to 250,000 net dry tons;

m. DEP has breached the 2012 Agreement because the Replenishment Plan earlier delivered to CTG by DEP, (Ex. 54), did not satisfy DEP's obligation under the 2012 Agreement to provide a Replenishment Plan consistent with the MMQ supply and acceptance obligations the Court has determined in this Opinion & Final Judgment;

n.  In the event that DEP takes any of those actions defined in Section 6.3 of the 2012 Agreement as a Discontinued Supply by DEP, such action will constitute a breach of DEP's supply obligation under the 2012 Agreement, providing CTG the option but not the obligation to terminate the agreement and recover liquidated damages pursuant to Section 6.3;

o.  If DEP takes action that constitutes a "Discontinued Supply" as defined in Section 6.3, CTG will have the option but not the obligation to exercise this remedy; however, in that event, Section 6.3 shall provide CTG's exclusive remedy for DEP's failure to supply Gypsum Filter Cake after taking such actions; and

p.  CTG continues to have the right to pursue its Section 6.2 remedies for any DEP supply failure occurring prior to DEP's taking action that constitutes a Discontinued Supply as defined by Section 6.3.

236.  Except as declared above, any further request by either party for declaratory relief is denied.

237.  DEP has failed to carry its burden of proof on its defenses.

238.  There is no factual or legal basis that bars CTG's remedies by application of the doctrines of unclean hands, waiver, or estoppel.

239.  DEP breached its obligation to supply the MMQ of 50,000 net dry tons per month, subject to fluctuations permitted by Section 3.1 of the 2012 Agreement,

for the months of May 2017, June 2017, and September 2017–January 2018. CTG provided the required notice and is entitled to its remedies under Section 6.2 of the 2012 Agreement.

240. CTG is entitled to recover from DEP that amount paid in excess of the contract price as stipulated in Exhibit 176, together with interest until paid.

241. DEP is obligated at its own expense to deliver to CTG such additional amounts as may be necessary to meet its supply obligation for the months of May 2017, June 2017, and September 2017–January 2018. Each party has requested that it be awarded its costs and attorneys' fees. The Court concludes that any consideration of this collateral issue should be deferred.

BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS HEREBY ORDERED THAT:

1. DEP shall pay to CTG the stipulated amount stated in Exhibit 176 as payments CTG has made in excess of the contract price, together with interest until paid;

2. DEP shall, within thirty days of this Opinion & Final Judgment, at the contract price, deliver as CTG directs, such amounts of Gypsum Filter Cake as are necessary to fulfill its obligations to supply the MMQ less acceptable minor fluctuations for the months of May 2017, June 2017, and September 2017–January 2018, and less amounts already accepted by CTG;

3. DEP shall within ninety days of this Opinion & Final Judgment provide CTG with a Replenishment Plant prepared consistent with the MMQ as the Court has defined it in this Opinion & Final Judgment;

4. In the absence of a timely appeal, any party that seeks to recover its costs and attorneys' fees pursuant to Section 16.7 of the 2012 Agreement shall file its motion, accompanied by a brief and supporting materials, within forty-five days of the date of this Opinion & Final Judgment;

5. In the event of a timely appeal, any party that seeks to recover its costs and attorneys' fees pursuant to Section 16.7 of the 2012 Agreement shall file its motion, accompanied by a brief and supporting materials, within thirty days of the final mandate of the highest appellate court;

6. Notwithstanding the reservation of the collateral issue of costs and attorneys' fees, this Opinion & Final Judgment is intended to be and is a final judgment in all respects pursuant to North Carolina Rule of Civil Procedure 54.

SO ORDERED, this the 28th day of August, 2018.

/s/ James L. Gale

James L. Gale
Senior Business Court Judge